## TUMEY *v.* OHIO.

### ERROR TO THE SUPREME COURT OF OHIO.

No. 527. Argued November 29, 30, 1926.—Decided March 7, 1927.

1. To subject a defendant to trial in a criminal case involving his liberty or property before a judge having a direct, personal, substantial interest in convicting him is a denial of due process of law. P. 522.
2. A system by which an inferior judge is paid for his service only when he convicts the defendant, has not become so customary in the common law or in this country that it can be regarded as due process where the costs usually imposed are not so small as to be within the maxim *de minimis non curat lex.* Pp. 523, 531.

3. Under statutes of Ohio, offenses against state prohibition, involving a wide range of fines enforcible by imprisonment, may be tried without a jury, before the mayor of any rural village situate in the county (however populous) in which offenses occur; his judgment upon the facts is final and conclusive unless so clearly unsupported as to indicate mistake, bias, or wilful disregard of duty; the fines are divided between the State and village; the village by means of the fines collected hires attorneys and detectives to arrest alleged offenders anywhere in the county and prosecute them before the mayor; in addition to his salary, the mayor, when he convicts, but not otherwise, receives his fees and costs amounting to a substantial income; the fines offer a means of adding materially to the financial prosperity of the village, for which the mayor, in his executive capacity, is responsible. *Held* violative of the Fourteenth Amendment. Pp. 520, 531.

115 Oh. St. 701, reversed.

ERROR to a judgment of the Supreme Court of Ohio, which declined to review a judgment of the State Court of Appeals, 22 Oh. L. Rep. 634, reversing a judgment of the Court of Common Pleas of Hamilton County, 25 Oh. Nisi Prius (N. S.) 580, which reversed a judgment of the Mayor of the Village of North College Hill convicting and fining Tumey for violation of the Ohio Prohibition Act and ordering that he be imprisoned until the fine and costs were paid.

*Messrs. Edward P. Moulinier* and *James L. Magrish, pro hac vice,* with whom *Mr. Harry H. Shafer* was on the brief, for plaintiff in error.

When a state deprives a person of liberty or property through a hearing held under statutes and circumstances which necessarily interfere with the course of justice, it deprives him of liberty and property without due process of law. *Moore* v. *Dempsey,* 261 U. S. 86; *Frank* v. *Mangum,* 237 U. S. 309.

A financial interest of a court in its decision constitutes that court an unfair and partial tribunal within the prohibition of the Fourteenth Amendment. *Grand Stahl* v. *Supervisors,* 187 Iowa 1342; *Re Ryers,* 72 N. Y. 1; *Case* v. *Hoffmann,* 100 Wis. 314; *Commrs.* v. *Smith,* 233 Ill.

417; *Meyers* v. *Shields,* 61 Fed. 713; Cooley, Const. Lim.,
p. 356. The mayor who tried this case was personally,
financially interested in his decision, for under the Ohio
law the mayor can receive no fee unless he finds the
defendant guilty. Op. Atty. Gen. (Ohio), 1915, p. 148.
When the question is merely whether the cost should be
paid by the plaintiff or defendant, it is held that the
judge is not disqualified because of financial interest.
Under the Ohio law, however, since the mayors of the
villages, sitting as courts of justice, do not receive any
fees unless they convict, an entirely different situation is
created.

Distinguishing, *Probasco* v. *Raine,* 50 Oh. St. 378. Cf.
*Meyers* v. *Shields,* 61 Fed. 713.

Aside from the personal financial interest of the mayor,
the record is clear that the mayor was operating the court
in order to make money for the village, of which he
was executive head, and which was in bad financial con-
dition. The greater the fine assessed by the court, the
greater the amount of money which the village would
receive. The mayor's interest as an executive head, his
operation of the court as a commercial venture to make
money for the village, made his so-called court but a
mask and a sham, in which there were the forms of ju-
dicial proceedings, but in fact no real judicial hearing.

A trial before a tribunal financially interested in the
result of its decision constitutes a denial of due process
of law. *Day* v. *Savadge,* Hobart 87; *London* v. *Wood,*
12 Mod. 669; *Landfear* v. *Mayor,* 4 La. 97. The follow-
ing cases show various degrees of money and other in-
terest which were held to disqualify: *Pierson* v. *Atwood,*
13 Mass. 324; *Gregory* v. *Railroad,* 4 Oh. St. 675; *State*
v. *Young,* 31 Fla. 594; *Nettleton's Appeal,* 28 Conn. 267;
*Dimes* v. *Canal,* 3 H. L. 759; *Moses* v. *Julian* 45 N. H.
52; *Stockwell* v. *Township,* 22 Mich. 341; *State* v. *Crane,*
36 N. J. L. 394; *Stuart* v. *Commonwealth,* 91 Va. 152;

*Findley* v. *Smith,* 42 W. Va. 299; *State* v. *Seattle,* 19 Wash. 8; *Ex parte Cornwell,* 144 Ala. 497; *Yazoo R. R.* v. *Kirk,* 102 Miss. 41.

*Messrs. Wayne B. Wheeler* and *Edward B. Dunford,* with whom *Messrs. D. W. Murphy* and *Charles M. Earhart* were on the brief, for defendant in error.

It is well settled that this court will not review the findings of a state court upon questions of fact. *Pure Oil Co.* v. *Minnesota,* 248 U. S. 158; *Hedrick* v. *A. T. & S. F. R. R. Co.,* 167 U. S. 673; 63 L. R. A. 577. The state court opinion shows no federal question necessary to its decision. Sec. 237(a), Jud. Code, as amended February 13, 1925.

Every step taken was authorized by legislative enactment. Imprisonment was not a part of the penalty and therefore the mayor had final jurisdiction and the defendant was not entitled to a jury trial. *Work* v. *State,* 2 Oh. St. 296; *Inwood* v. *State,* 42 Oh. St. 186; *State* v. *Borham,* 72 Oh. St. 358; *Hoffrichter* v. *State,* 102 Oh. St. 65; *Stiess* v. *State,* 103 Oh. St. 33; *State* v. *Pape,* 105 Oh. St. 515; *Cochran* v. *State,* 105 Oh. St. 541. Fees which the mayor and marshal of College Hill received belonged to them by virtue of the general statutes of the State applying to all state cases, liquor and otherwise. *Nead* v. *Nolte,* 111 Oh. St. 486.

The mayor's interest in costs, allowed by law upon conviction, did not disqualify him. His remuneration was the same whether the maximum or minimum fine was imposed. The minimum fine was imposed in this case, which negatives the suggestion of a conspiracy to mulct the accused for the benefit of the prosecuting witnesses and attorney.

Costs in criminal cases at common law were unknown. They were created by statute. That there was no provision for taxing costs in the event of acquittal, and that

the mayor could assess costs only upon conviction, except as he might require bond for costs from unofficial prosecutors, as provided in § 13499 of the General Code, did not *per se* disqualify him to try the offense. It is the almost universal rule that in the absence of specific legislation the State is not liable for costs. It is the general practice to provide for the assessment of trial fees in the event of conviction. That such costs are collectible only upon conviction does not constitute a denial of due process of law. *Ex parte Guerrero,* 69 Cal. 88; *Bennett* v. *State;* 4 Tex. App. 72; *People* v. *Edmunds,* 15 Barb. 529; *Commonwealth* v. *Keenan,* 97 Mass. 589; *Wellmaker* v. *Terrell,* 3 Ga. App. 791; *Pace* v. *Hazelhurst,* 9 Ga. App. 203; *Longston* v. *Hazelhurst, id.* 449. Legislation providing for the taxation of costs against the accused upon conviction is predicated upon the theory of making the violator bear the expense to which he has placed the State in securing his apprehension and punishment.

The mayor's interest as taxpayer in municipal revenue from state fines did not disqualify him. *Ex parte Guerrero, supra; State* v. *Intoxicating Liquors,* 54 Me. 564; *State* v. *Craig,* 80 Me. 85; *Commonwealth* v. *Emery,* 11 Cush. 406; *Hanscarrib* v. *Russell,* 11 Gray 373; *State* v. *Batchelder,* 6 Vt. 479; *Colgate* v. *Hill,* 20 Vt. 56. The courts cannot declare a policy different from that fixed by the legislature. *Allen* v. *Smith,* 84 Oh. St. 283; *Vidal* v. *Girard's Executors,* 2 How. 128; *Dewey* v. *United States,* 178 U. S. 510.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

· The question in this case is whether certain statutes of Ohio, in providing for the trial by the mayor of a village of one accused of violating the Prohibition Act of the State, deprive the accused of due process of law and violate the Fourteenth Amendment to the Federal Constitu-

tion, because of the pecuniary and other interest which those statutes give the mayor in the result of the trial.

Tumey, the plaintiff in error, hereafter to be called the defendant, was arrested and brought before Mayor Pugh, of the Village of North College Hill, charged with unlawfully possessing intoxicating liquor. He moved for his dismissal because of the disqualification of the Mayor to try him, under the Fourteenth Amendment. The Mayor denied the motion, proceeded to the trial, convicted the defendant of unlawfully possessing intoxicating liquor within Hamilton County, as charged, fined him $100, and ordered that he be imprisoned until the fine and costs were paid. He obtained a bill of exceptions and carried the case on error to the Court of Common Pleas of Hamilton County. That court heard the case and reversed the judgment, on the ground that the Mayor was disqualified, as claimed. 25 Ohio Nisi Prius (N. s.) 580. The State sought review by the Court of Appeals of the first appellate district of Ohio, which reversed the Common Pleas and affirmed the judgment of the Mayor. 23 Ohio Law Reporter, 634.

On May 4, 1926, the State Supreme Court refused defendant's application to require the Court of Appeals to certify its record in the case. The defendant then filed a petition in error in that court as of right, asking that the judgment of the Mayor's Court and of the Appellate Court be reversed, on constitutional grounds. On May 11, 1926, the Supreme Court adjudged that the petition be dismissed for the reason that no debatable constitutional question was involved in the cause. The judgment was then brought here upon a writ of error allowed by the Chief Justice of the State Supreme Court, to which it was rightly directed. *Matthews* v. *Huwe, Treasurer,* 269 U. S. 262; *Hetrick* v. *Village of Lindsey,* 265 U. S. 384. This brings us to the merits of the case.

The defendant was arrested and charged with the unlawful possession of intoxicating liquor at White Oak, another village in Hamilton County, Ohio, on a warrant issued by the Mayor of North College Hill. The Mayor acted under the sections of the State Prohibition Act, and Ordinance No. 125 of the Village of North College Hill adopted in pursuance thereof.

Section 6212–15 (Ohio General Code) provides that " No person shall after the passage of this act manufacture . . . possess . . . any intoxicating liquors . . ."

Section 6212–17 provides that ". . . any person who violates the provisions of this act (General Code, Sections 6212–13 to 6212–20) for a first offense shall be fined not less than one hundred dollars nor more than one thousand dollars; for a second offense he shall be fined not less than three hundred dollars nor more than two thousand dollars; for a third and each subsequent offense he shall be fined not less than five hundred dollars nor more than two thousand dollars and be imprisoned in the state penitentiary not less than one year nor more than five years. . . ."

The Mayor has authority, which he exercised in this case, to order that the person sentenced to pay a fine shall remain in prison until the fine and costs are paid. At the time of this sentence, the prisoner received a credit of sixty cents a day for each day's imprisonment. By a recent amendment, that credit has been increased to one dollar and a half a day. Sections 13716, 13717, Ohio Gen. Code.

Section 6212–18 provides, in part, that "Any justice of the peace, mayor, municipal or police judge, probate or common pleas judge within the county with whom the affidavit is filed charging a violation of any of the provisions of this act (G. C. Sections 6212–13 to 6212–20) when the offense is alleged to have been committed in the county in which such mayor, justice of the peace, or judge

may be sitting, shall have final jurisdiction to try such cases upon such affidavits without a jury, unless imprisonment is a part of the penalty, but error may be prosecuted to the judgment of such mayor, justice of the peace, or judge as herein provided."

Error from the Mayor's Court lies to the court of Common Pleas of the County, and a bill of exceptions is necessary to present questions arising on the evidence. Sections 10359, 10361, Ohio General Code. The appellate review in respect of evidence is such that the judgment can only be set aside by the reviewing court on the ground that it is so clearly unsupported by the weight of the evidence as to indicate some misapprehension or mistake or bias on the part of the trial court, or a wilful disregard of duties. *Datesh* v. *State,* 23 Ohio Nisi Prius (N. S.) 273.

Section 6212–19, provides that " Money arising from fines and forfeited bonds shall be paid one-half into the state treasury credited to the general revenue fund, one-half to the treasury of the township, municipality, or county where the prosecution is held, according as to whether the officer hearing the case is a township, municipal, or county officer."

Section 6212–37 provides that " The council of any city or village may by ordinance, authorize the use of any part of the fines collected for the violation of any law prohibiting the manufacture and sale of intoxicating liquors, for the purpose of hiring attorneys, detectives, or secret service officers to secure the enforcement of such prohibition law. And such council are hereby authorized to appropriate not more than five hundred dollars annually from the general revenue funds, for the purpose of enforcing the law prohibiting the manufacture and sale of intoxicating liquors, when there are no funds available from the fines collected for the violation of such prohibitory law."

Under the authority of the last section, the Village Council of North College Hill passed Ordinance No. 125, as follows:

" An ordinance to provide for compensation to be paid
from the secret service funds of the Village of North
College Hill, Hamilton County, Ohio, created by authority
of Section 6212–37, of the General Code of Ohio, to detec-
tives, secret service officers, deputy marshals' and attor-
neys' fees, costs, etc., for services in securing evidence
necessary to conviction and prosecuting violation of the
law of the state of Ohio prohibiting the liquor traffic.

" Be it ordained by the Council of the Village of North
College Hill, Hamilton County, Ohio:

" Section I. That fifty per cent of all moneys hereafter
paid into the treasury of said village of North College
Hill, Ohio, that is one-half of the share of all fines collected
and paid into and belonging to said village of North Col-
lege Hill, Ohio, received from fines collected under any law
of the state of Ohio, prohibiting the liquor traffic, shall
constitute a separate fund to be called the Secret Service
Fund to be used for the purpose of securing the enforce-
ment of any prohibition law.

" Section II. That deputy marshals of the village of
North College Hill, Ohio, shall receive as compensation
for their services in securing the evidence necessary to
secure the conviction of persons violating the law of the
state of Ohio, prohibiting the liquor traffic, an amount of
money equal to 15 per cent. of the fine collected, and other
fees allowed by law.

" Section III. That the attorney at law of record prose-
cuting persons charged with violating the law of the state
of Ohio, prohibiting the liquor traffic, shall receive as com-
pensation for legal services an amount equal to 10 per
cent. of the fine collected, in all cases, whether the plea be
guilty or not guilty.

" Section IV. That detectives and secret service officers
shall receive as compensation for their services in secur-
ing the evidence necessary to secure the conviction of

persons violating the law of the state of Ohio, prohibiting the liquor traffic, an amount of money equal to 15 per cent. of the fine collected.

" Section V. That the mayor of the village of North College Hill, Ohio, shall receive or retain the amount of his costs in each case, in addition to his regular salary, as compensation for hearing such cases.

" Section VI. This ordinance is hereby declared to be an emergency ordinance, necessary to the immediate preservation of the public peace and safety, made necessary by reason of the flagrant violation of the laws of Ohio, enacted to prohibit traffic in intoxicating liquors, and shall be in effect from and after its passage."

The duties of the Mayor of a village in Ohio are primarily executive. Sections of the General Code of Ohio provide as follows:

" Section 4248. The executive power and authority of villages shall be vested in a mayor, clerk, treasurer, marshal, street commissioner, and such other officers and departments thereof as are created by law.

" Section 4255. . . . He (the Mayor) shall be the chief conservator of the peace within the corporation. . . . He shall be the president of the council, and shall preside at all regular and special meetings thereof, but shall have no vote except in case of a tie.

" Section 4258. . . . He shall see that all ordinances, by-laws and resolutions are faithfully obeyed and enforced. . . .

" Section 4259. The mayor shall communicate to council from time to time a statement of the finances of the municipality, and such other information relating thereto and to the general condition of affairs of the municipality as he deems proper or as may be required by council.

" Section 4262. The mayor shall supervise the conduct of all the officers of the corporation. . . ."

The fees which the Mayor and Marshal received in this case came to them by virtue of the general statutes of the state applying to all state cases, liquor and otherwise. The Mayor was entitled to hold the legal fees taxed in his favor. Ohio General Code, § 4270; *State* v. *Nolte,* 111 O. S. 486. Moreover, the North College Hill village council sought to remove all doubt on this point by providing (§ 5, Ord. 125, *supra*), that he should receive or retain the amount of his costs in each case, in addition to his regular salary, as compensation for hearing such cases. But no fees or costs in such cases are paid him except by the defendant if convicted. There is, therefore, no way by which the Mayor may be paid for his service as judge, if he does not convict those who are brought before him; nor is there any fund from which marshals, inspectors and detectives can be paid for their services in arresting and bringing to trial and furnishing the evidence to convict in such cases, except it be from the initial $500 which the village may vote from its treasury to set the court going, or from a fund created by the fines thereafter collected from convicted defendants.

By an Act of 1913 (103 O. L. 290), the Mayor's court in villages in Hamilton County and in half a dozen other counties with large cities, was deprived of jurisdiction to hear and punish misdemeanors committed in the county beyond the limits of the corporation. The Prohibition Act, known as the Crabbe Act, adopted in 1920 (108 O. L., Pt. 1, 388 and Pt. 2, 1182) changed this, and gave to the Mayor of every village in the State jurisdiction within the county in which it was situate to try violations of that Act.

Counsel for the State in their brief explain the vesting by state legislatures of this country of jurisdiction in village courts as follows: " The purpose of extending the jurisdiction in the first instance was to break up places of outlawry that were located on the municipal boundary just outside of the city. The Legislature also

faced the situation that in some of the cities the law enforcement agencies were failing to perform their duty, and, therefore, in order that those forces that believe in enforcement and upholding of law might have some courts through which process could be had, it gave to mayors county-wide jurisdiction." It was further pointed out in argument that the system by which the fines to be collected were to be divided between the State and the village was for the proper purpose of stimulating the activities of the village officers to such due enforcement.

The Village of North College Hill in Hamilton County, Ohio, is shown by the federal census to have a population of 1104. That of Hamilton County, including the City of Cincinnati, is more than half a million. The evidence discloses that Mayor Pugh came to office after ordinance No. 125 was adopted, and that there was a division of public sentiment in the village as to whether the ordinance should continue in effect. A petition opposing it and signed by a majority of the voters was presented to Mayor Pugh. To this the Mayor answered with the declaration that, if the village was in need of finances, he was in favor of and would carry on " the Liquor Court," as it was popularly called, but that if the court was not needed for village financial reasons, he would not do so. It appears that substantial sums were expended out of the village treasury, from the fund made up of the fines thus collected, for village improvements and repairs. The Mayor was the owner of a house in the village.

Between May 11, 1923 and December 31, 1923, the total amount of fines for violation of the prohibition law, collected by this village court, was upwards of $20,000, from which the State received $8,992.50, North College Hill received $4,471.25 for its general uses, $2,697.25 was placed to the credit of the village safety fund, and the balance was put in the secret service fund. Out of this, the person acting as prosecutor in the liquor court re-

ceived in that period $1,796.50; the deputy marshals,
inspectors and other employees, including the detectives,
received $2,697.75, and $438.50 was paid for costs in
transporting prisoners, serving writs and other services in
connection with the trial of these cases. Mayor Pugh
received $696.35 from these liquor cases during that
period, as his fees and costs, in addition to his regular
salary.

That officers acting in a judicial or quasi-judicial capac-
ity are disqualified by their interest in the controversy to
be decided is, of course, the general rule. *Dimes* v. *Grand
Junction Canal,* 3 H. L. C. 759; *Gregory* v. *Railroad,*
4 O. S. 675; *Peace* v. *Atwood,* 13 Mass. 324; *Taylor* v.
*Commissioners,* 105 Mass. 225; *Kentish Artillery* v. *Gardi-
ner,* 15 R. I. 296; *Moses* v. *Julian,* 45 N. H. 52; *State* v.
*Crane,* 36 N. J. L. 394; *Railroad Company* v. *Howard,*
20 Mich. 18; *Stockwell* v. *Township,* 22 Mich. 341; *Find-
ley* v. *Smith,* 42 W. Va. 299; *Nettleton's Appeal,* 28 Conn.
268; Cooley's Constitutional Limitations, 7th ed., p. 592,
*et seq.* Nice questions, however, often arise as to what
the degree or nature of the interest must be. One is in
respect of the effect of the membership of a judge in a
class of taxpayers or others to be affected by a principle
of law, statutory or constitutional, to be applied in a case
between other parties and in which the judge has no other
interest. Then the circumstance that there is no judge
not equally disqualified to act in such a case has been held
to affect the question. *Wheeling* v. *Black,* 25 W. Va.
266, 280; *Peck* v. *Freeholders of Essex,* 20 N. J. L. 457;
*Dimes* v. *Grand Junction Canal,* 3 H. L. C. 759 (see Baron
Parke's Answer for the Judges, pp. 785, 787); Year Book,
8 Henry 6, 19, s. c. 2 Roll. Abridg. 93; *Evans* v. *Gore,*
253 U. S. 245, 247; *Stuart* v. *Mechanics' & Farmers' Bank,*
19 Johns. 496; *Ranger* v. *Railroad,* 5 H. L. C. 72. We are
not embarrassed by such considerations here, for there
were available in this case other judicial officers who had

no disqualification either by reason of the character of their compensation or their relation to the village government.

All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. *Wheeling* v. *Black,* 25 W. Va. 266, 270. But it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.

The Mayor of the Village of North College Hill, Ohio, had a direct, personal, pecuniary interest in convicting the defendant who came before him for trial, in the twelve dollars of costs imposed in his behalf, which he would not have received if the defendant had been acquitted. This was not exceptional, but was the result of the normal operation of the law and the ordinance. Counsel for the State do not deny this, but assert the validity of the practice as an exception to the general rule. They rely upon the cases of *Ownbey* v. *Morgan,* 256 U. S. 94; *Murray's Lessee* v. *Hoboken Land and Improvement Company,* 18 How. 272, 276–280. These cases show that, in determining what due process of law is, under the Fifth or Fourteenth Amendment, the Court must look to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, which were shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country. Counsel contend that in Ohio and in other States, in the economy which it is found necessary to maintain in the administration of justice in the inferior courts by justices of the peace and by judicial officers of like jurisdiction, the only compensation which the State and county

and township can afford is the fees and costs earned by them, and that such compensation is so small that it is not to be regarded as likely to influence improperly a judicial officer in the discharge of his duty, or as prejudicing the defendant in securing justice, even though the magistrate will receive nothing if the defendant is not convicted.

We have been referred to no cases at common law in England prior to the separation of colonies from the mother country showing a practice that inferior judicial officers were dependent upon the conviction of the defendant for receiving their compensation. Indeed, in analogous cases it is very clear that the slightest pecuniary interest of any officer, judicial or quasi-judicial, in the resolving of the subject matter which he was to decide, rendered the decision voidable. *Bonham's Case,* 8 Coke, 118a; s. c. 2 Brownlow and Goldesborough's Rep. 255; *City of London* v. *Wood,* 12 Modern Rep. 669, 687; *Day* v. *Savage,* Hobart 85, 87; *Hesketh* v. *Braddock,* 3 Burrows 1847, 1856, 1857 and 1858.

As early as the 12th Richard II, A. D. 1388, it was provided that there should be a commission of the justices of the peace, with six justices in the county once a quarter, which might sit for three days, and that the justices should receive four shillings a day " as wages," to be paid by the sheriffs out of a fund made up of fines and amercements, and that that fund should be added to out of the fines and amercements from the courts of the Lords of the Franchises, which were hundred courts allowed by the King by grant to individuals.

It was required that the justices of the peace should be knights, esquires or gentlemen of the land,—qualifications that were not modified until 1906. The wages paid were used " to defray their common diet," and soon became obsolete. 1 Holdsworth's History of English Law, 288, 289. The wages paid were not dependent on con-

viction of the defendant. They were paid at a time when the distinction between torts and criminal cases was not clear, Holdsworth, Vol. 2, 363, 365; Vol. 3, 328; and they came from a fund which was created by fines and amercements collected from both sides in the controversy. There was always a plaintiff, whether in the action for a tort or the prosecution for an offense. In the latter he was called the prosecutor. If he failed to prove his case, whether civil or criminal, he was subject to amercement *pro falso clamore,* while if he succeeded, the defendant was *in misericordia.* See *Comm.* v. *Johnson,* 5 S. & R. (Pa.) 195, 198; *Musser* v. *Good,* 11 *Id.* 247. Thus in the outcome someone would be amerced in every case, and the amercements generally went to the Crown, and the fund was considerable. The Statute of Richard II remained on the statute book until 1855, when it was repealed by the 18th and 19th Victoria. Meantime the hundred courts by franchise had-largely disappeared. The wages referred to were not part of the costs. The costs at common law were the amounts paid either by the plaintiff or prosecutor or by the defendant for the witnesses or services of the court officers. Burn's Justice, Vol. 1, p. 628. Chitty's Criminal Law, 4 ed. 1841, Vol. 1, 829. See also 14 George III, ch. 20, 1774. For hundreds of years the justices of the peace of England seem not to have received compensation for court work. Instead of that, they were required, upon entering upon the office, to pay certain fees. Holdsworth, Vol. 1, p. 289; 19 Halsbury's Laws of England, § 1152. Local judges in towns are paid salaries.

There was at the common law the greatest sensitiveness over the existence of any pecuniary interest, however small or infinitesimal, in the justices of the peace. In Hawkins, 2 Pleas of the Crown, we find the following:

" The general rule of law certainly is that justices of the peace ought not to execute their office in their own case [citing 1 Salk. 396]; and even in cases where such

proceeding seems indispensably necessary, as in being publicly assaulted or personally abused, or their authority otherwise contemned while in the execution of their duty, yet if another justice be present, his assistance should be required to punish the offender (Stra. 240).

"And by the common law, if an order of removal were made by two justices, and one of them was an inhabitant of the parish from which the pauper was removed, such order was illegal and bad, on the ground that the justice who was an inhabitant was interested, as being liable to the poor's rate. (*Rex.* v. *Great Chart,* Burr. S. C. 194, Stra. 1173.)"

And this strict principle, unless there is relief by the statute, is seen in modern cases. *Queen* v. *The Recorder of Cambridge,* 8 Ellis & Blackburn, 637; *Regina* v. *Hammond,* 9 Law Times Reports (N. s.) 423; *The Queen* v. *Rand,* Law Reports, 1st Queen's Bench, 230; *Queen* v. *Gaisford,* 1st Queen's Bench Division, 381; 19 Halsbury's Laws of England 1156.

There was, then, no usage at common law by which justices of the peace or inferior judicial officers were paid fees on condition that they convicted the defendants, and such a practice certainly can not find support as due process of law in English precedent. It may be that the principle, as stated in Blackstone, Book 3rd, page 400, that the King shall neither pay nor receive costs, because it is the King's prerogative not to pay them to a subject and is beneath his dignity to receive them, was misunderstood and led, as suggested by Mr. Lewis in his edition of Blackstone, Vol. 3, p. 400, n. 60, to the practice in some States, in minor cases, of allowing inferior judges no compensation except by fees collected of the convicted defendant; but whether it did or not, the principle relied on did not support the practice. That practice has prevailed, and still prevails, in Arkansas, Kentucky, Nebraska, North Carolina, Georgia, Ohio and Texas, and it seems

at one time to have obtained in Indiana, Oregon, Illinois and Alabama.

In two of these States only has the question been considered by their courts, and it has been held that provision for payment to the judge of fees, only in case of conviction, does not disqualify him. Those are *Bennett* v. *State,* 4 Tex. App. 72; *Wellmaker* v. *Terrell,* 3 Ga. App. 791. There is no discussion in either of the question of due process of law. The existence of a statute authorizing the practice seems to have been the controlling consideration. Two other cases are cited. In *Ex parte Guerrero,* 69 Cal. 88, the judge was paid a regular salary, fixed by law. The fund out of which this was paid was increased by fees and fines collected in his court, but there is no evidence that payment of his salary was dependent on the amount of his collections or convictions. In *Herbert* v. *Baltimore County,* 97 Md. 639, the action was by a justice of the peace against a county for services in criminal cases. A new law limited him to $10 a month. The statement of the case does not distinctly show that in convictions he would have had a larger compensation from his costs collected out of the defendant, but this may be assumed from the argument. His contention was that the new law was invalid because it did not give the defendants before him due process. The court held against him, chiefly on the ground that he must be satisfied with the compensation the law afforded him. Responding to his argument that the new law was invalid because justices would be induced to convict when in justice they should acquit, the court said:

" We can not recognize the force of this suggestion, founded as it is upon the assumption that the justices will violate their oaths and the duties of their office and not upon anything that the law authorizes to be done.".

So far as the case goes, it is an authority for the contention of the State, but the issue thus raised was not

considered at length and was not one which in such an action the court would be patient to hear pressed by the justice whose constitutional rights were not affected. *Tyler* v. *Court,* 179 U. S. 405, 409; *California Reduction Co.* v. *Sanitary Reduction Works,* 199 U. S. 306, 318.

In the case of *Probasco* v. *Raine, Auditor,* 50 O. S. 378, the question arose whether the fee of 4 per cent. payable to county auditors for placing omitted property on the duplicate list for taxation, which required investigation and quasi-judicial consideration, was invalid. The court held that it was not, and that the objection urged there could not be based on the argument that a man could not be a judge in his own case; that the auditor had no case to be adjudged, but that on the contrary he was the taxing officer before whom other parties were cited to appear and show cause why they should not bear their equal burden of taxation. The court said that the action of the auditor was not final so as to cut off further inquiry, but that the whole case might be gone into anew by proper proceedings in court. An exactly opposite conclusion was reached by the United States Circuit Court for the Northern District of Ohio in *Meyers* v. *Shields,* 61 Fed. 713, 725 *et seq.*

In other States than those above mentioned, the minor courts are paid for their services by the State or county regardless of acquittal or conviction, except that in Virginia the minor courts receive one-half of the usual fees where there is acquittal. Four States have put into their constitutions a provision that the State must pay the costs in such cases, in case of acquittal. They are California, Florida, Louisiana and South Carolina.

The strict common law rule was adopted in this country as one to be enforced where nothing but the common law controlled, and citizens and taxpayers have been held incompetent to sit in suits against the municipal corporation of which they have been residents. *Diveny* v.

*Elmira,* 51 N. Y. 506; *Corwein* v. *Hames,* 11 Johns. 76;
*Clark* v. *Lamb,* 2 Allen 396; *Dively* v. *Cedar Falls,* 21
Iowa 565; *Fulweiler* v. *St. Louis,* 61 Mo. 479; *Petition of
New Boston,* 49 N. H. 328; *Commonwealth* v. *McLane,*
4 Gray 427; *Fine* v. *St. Louis Public Schools,* 30 Mo. 166,
173. With other courts, however, and with the legisla-
tures, the strict rule seemed to be inconvenient, imprac-
ticable and unnecessary, and the view was taken that
such remote or minute interest in the litigation might be
declared by the Legislature not to be a reason for dis-
qualification of a judge or juror.

A case, much cited, in which this conclusion was
reached and in which the old English corporation cases
were considered, was that of *City Council* v. *Pepper,* 1
Richardson (S. C.) 364. The recorder of the City of
Charleston sentenced a non-resident of the city for viola-
tion of a city ordinance requiring him to take out a license
for what he did or to pay a fine not exceeding $20. The
contention was that the defendant was a non-corporator
and non-resident and not subject to the jurisdiction of the
city court; that the recorder was a corporator and inter-
ested in the penalty and therefore was not competent to
try the cause. The Court said (p. 366) in respect to
*Hesketh* v. *Braddock,* 3 Burrows 1847, *supra:*

" It will be remarked that that case depends altogether
upon the common law, and if the city court depended
upon the same for its jurisdiction, the objection might be
fatal. But the establishment and jurisdiction of the city
court commences with the Act of 1801. By that Act it
is clothed with the power of trying all offences against
the by-laws of the city, and for that purpose is given con-
current jurisdiction with the court of Sessions. This
grant of power is from all the people of the State, through
their Legislature, and surely they have the power to
dispense with the common law objection, that the cor-

porators were interested, and ought not to be intrusted with the enforcement of their laws against others. The authority given to the city court to try all offenders against the city ordinances, impliedly declares, that notwithstanding the common law objection, it was right and proper to give it the power to enforce the city laws against all offenders. That there was great reason in this can not be doubted, when it is remembered that the interest of the corporators is so minute as not to be even thought of, by sheriff, juror or judge. It is very much like the interest which similar officers would feel in enforcing a State law, the sanction of which was a penalty. The sum thus to be recovered goes in exoneration of some part of the burden of government to which every citizen is subjected; but such an interest has no effect upon the mind. It is too slight to excite prejudice against a defendant. The same thing is the case here. For the judge, sheriff and jurors, are members of a corporation of many thousand members. What interest, of value, have they in a fine of twenty dollars? It would put a most eminent calculator to great trouble to ascertain the very minute grain of interest which each of these gentlemen might have. To remove so shadowy and slight an objection, the Legislature thought proper to clothe the city court, consisting of its judge, clerk, sheriff and jurors, with authority to try the defendant, and he can not now object to it."

And the same view is taken in *Commonwealth* v. *Ryan,* 5 Mass. 90; *Commonwealth* v. *Reed,* 1 Gray 472, 475; *Thomas* v. *Mt. Vernon,* 9 Ohio 290; *Commissioners* v. *Lytle,* 3 Ohio 289; *Wheeling* v. *Black,* 25 W. Va. 266, 280; *Board of Justices* v. *Fennimore,* 1 N. J. L. 190; *Foreman* v. *Mariana,* 43 Ark. 324; *Cartersville* v. *Lyon,* 69 Ga. 577; *Omaha* v. *Olmstead,* 5 Neb. 446; *Hill* v. *Wells,* 6 Pickering 104; *Commonwealth* v. *Emery,* 11 Cushing 406; *Barnett*

*v. State,* 4 Tex. App. 72; *Wellmaker* v. *Terrell,* 3 Ga. App. 791; *State* v. *Craig,* 80 Maine 85.

Mr. Justice Cooley, in his work on Constitutional Limitations, 7th edition, page 594, points out that the real ground of the ruling in these cases is that "interest is so remote, trifling and insignificant that it may fairly be supposed to be incapable of affecting the judgment of or of influencing the conduct of an individual. And where penalties are imposed, to be recovered only in a municipal court, the judge or jurors in which would be interested as corporators in the recovery, the law providing for such recovery must be regarded as precluding the objection of interest." But the learned judge then proceeds:

"But except in cases resting upon such reasons, we do not see how the legislature can have any power to abolish a maxim which is among the fundamentals of judicial authority."

Referring then to a remark in the case of the *Matter of Leefe,* 2 Barb. Ch. 39, that the people of the State when framing their constitution might possibly establish so great an anomaly, if they saw fit, the learned author says:

"Even this must be deemed doubtful since the adoption of the fourteenth article of the amendments to the Federal Constitution, which denies to the state the right to deprive one of life, liberty or property, without due process of law."

From this review we conclude, that a system by which an inferior judge is paid for his service only when he convicts the defendant has not become so embedded by custom in the general practice either at common law or in this country that it can be regarded as due process of law, unless the costs usually imposed are so small that they may be properly ignored as within the maxim *de minimis non curat lex.*

The Mayor received for his fees and costs in the present case $12, and from such costs under the Prohibition Act

for seven months he made about $100 a month, in addition
to his salary.  We can not regard the prospect of receipt
or loss of such an emolument in each case as a minute,
remote, trifling or insignificant interest.  It is certainly
not fair to each defendant, brought before the Mayor for
the careful and judicial consideration of his guilt or inno-
cence, that the prospect of such a loss by the Mayor
should weigh against his acquittal.

These are not cases in which the penalties and the costs
are negligible.  The field of jurisdiction is not that of a
small community engaged in enforcing its own local regu-
lations.  The court is a state agency, imposing substantial
punishment, and the cases to be considered are gathered
from the whole county by the energy of the village mar-
shals, and detectives regularly employed by the village
for the purpose.  It is not to be treated as a mere village
tribunal for village peccadilloes.  There are doubtless
mayors who would not allow such a consideration as $12
costs in each case to affect their judgment in it; but the
requirement of due process of law in judicial procedure is
not satisfied by the argument that men of the highest
honor and the greatest self-sacrifice could carry it on with-
out danger of injustice.  Every procedure which would
offer a possible temptation to the average man as a judge
to forget the burden of proof required to convict the
defendant, or which might lead him not to hold the bal-
ance nice, clear and true between the State and the
accused, denies the latter due process of law.

But the pecuniary interest of the Mayor in the result
of his judgment is not the only reason for holding that due
process of law is denied to the defendant here.  The stat-
utes were drawn to stimulate small municipalities in the
country part of counties in which there are large cities, to
organize and maintain courts to try persons accused of
violations of the Prohibition Act everywhere in the
county.  The inducement is offered of dividing between

the State and the village the large fines provided by the law for its violations. The trial is to be had before a mayor without a jury, without opportunity for retrial and with a review confined to questions of law presented by a bill of exceptions, with no opportunity by the reviewing court to set aside the judgment on the weighing of evidence, unless it should appear to be so manifestly against the evidence as to indicate mistake, bias or willful disregard of duty by the trial court. The statute specifically authorizes the village to employ detectives, deputy marshals and other assistants to detect crime of this kind all over the county, and to bring offenders before the Mayor's court, and it offers to the village council and its officers a means of substantially adding to the income of the village to relieve it from further taxation. The mayor is the chief executive of the village. He supervises all the other executive officers. He is charged with the business of looking after the finances of the village. It appears from the evidence in this case, and would be plain if the evidence did not show it, that the law is calculated to awaken the interest of all those in the village charged with the responsibility of raising the public money and expending it, in the pecuniarily successful conduct of such a court. The mayor represents the village and can not escape his representative capacity. On the other hand, he is given the judicial duty, first, of determining whether the defendant is guilty at all, and second, having found his guilt, to measure his punishment between $100 as a minimum and $1,000 as a maximum for first offenses, and $300 as a minimum and $2,000 as a maximum for second offenses. With his interest, as mayor, in the financial condition of the village, and his responsibility therefor, might not a defendant with reason say that he feared he could not get a fair trial or a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine? The old English cases, cited above, of the

days of Coke and Holt and Mansfield, are not nearly so strong. A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him. *City of Boston* v. *Baldwin,* 139 Mass. 315; *Florida ex rel. Colcord* v. *Young,* 31 Fla. 594. It is, of course, so common to vest the mayor of villages with inferior judicial functions that the mere union of the executive power and the judicial power in him can not be said to violate due process of law. The minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the mayor may pronounce final judgment without a jury, do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact. The difference between such a case and the plan and operation of the statutes before us is so plain as not to call for further elaboration.

Counsel for the State argue that it has been decided by this Court that the legislature of a State may provide such system of courts as it chooses; that there is nothing in the Fourteenth Amendment that requires a jury trial for any offender; that it may give such territorial jurisdiction to its courts as it sees fit; and therefore that there is nothing sinister or constitutionally invalid in giving to a village mayor the jurisdiction of a justice of the peace to try misdemeanors committed anywhere in the county, even though the mayor presides over a village of 1,100 people and exercises jurisdiction over offenses committed in a county of 500,000. This is true and is established by the decisions of this Court in *Missouri* v. *Lewis,* 101 U. S. 22, 30; *In re Claasen,* 140 U. S. 200. See also *Carey* v. *State,* 70 Ohio State 121. It is also correctly pointed out that it is completely within the power of the legislature to dispose of the fines collected

in criminal cases as it will, and it may therefore divide
the fines as it does here, one-half to the State and one-
half to the village by whose mayor they are imposed and
collected.   It is further said with truth that the legis-
lature of a State may, and often ought to, stimulate
prosecutions for crime by offering to those who shall
initiate and carry on such prosecutions rewards for thus
acting in the interest of the State and the people.  The
legislature may offer rewards or a percentage of the re-
covery to informers. *United States* v. *Murphy & Morgan,*
16 Pet. 203.   It may authorize the employment of de-
tectives.   But these principles do not at all affect the
question whether the State by the operation of the stat-
utes we have considered has not vested the judicial power
in one who by reason of his interest, both as an individ-
ual and as chief executive of the village, is disqualified to
exercise it in the trial of the defendant.

It is finally argued that the evidence shows clearly that
the defendant was guilty and that he was only fined $100,
which was the minimum amount, and therefore that he
can not complain of a lack of due process, either in his
conviction or in the amount of the judgment.  The plea
was not guilty and he was convicted.  No matter what
the evidence was against him, he had the right to have an
impartial judge.  He seasonably raised the objection and
was entitled to halt the trial because of the disqualifi-
cation of the judge, which existed both because of his
direct pecuniary interest in the outcome, and because of
his official motive to convict and to graduate the fine to
help the financial needs of the village.  There were thus
presented at the outset both features of the disqualifi-
cation.

The judgment of the Supreme Court of Ohio must be
reversed and the cause remanded for further proceedings
not inconsistent with this opinion.

*Judgment reversed.*