MURRAY v WILNER

Docket No. 50386. Submitted February 3, 1982, at Detroit.—Decided July 21, 1982. Leave to appeal applied for.

Defendant, Irwin A. Wilner, M.D., fitted plaintiff Mona Murray with an intrauterine device. Subsequently, Wilner performed a tubal ligation on the plaintiff but failed to remove the IUD. The IUD thereafter became partially imbedded in the plaintiff's endometrium and the plaintiff became ill with endometritis. Prior to the tubal ligation, the plantiff signed an arbitration agreement form. The plaintiff filed a medical malpractice action in Wayne Circuit Court against the defendant. The court, Robert J. Colombo, J., granted accelerated judgment to the defendant because the arbitration agreement deprived the court of jurisdiction. The plaintiff appeals alleging that the arbitration agreement was invalid because: (1) the arbitration statute violates her due process right to a hearing before a fair and impartial tribunal by requiring that at least one member of the arbitration panel be a physician or hospital administrator; (2) the agreement is unconscionable because its terms are beyond the comprehension and reasonable expectation of an ordinary person faced with prospective medical treatment or hospitalization, and (3) the agreement constituted a contract of adhesion. *Held:*

1. The medical malpractice arbitration act denies a claimant due process because a hearing before an unbiased and impartial decision-maker is basic to the concept of due process of law. Due process rights are violated where a medical malpractice arbitration panel must employ either a doctor or hospital administrator among its members. The danger of partisanship by a doctor or hospital administrator serving on an arbitration panel is sufficient to violate due process standards requiring a fair and impartial decision-maker.

2. The arbitration agreement form is not unconscionable.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 17 Am Jur 2d, Contracts § 5.
    61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 376.
    Arbitration of medical malpractice claims. 84 ALR3d 375.
[3] 5 Am Jur 2d, Arbitration and Award § 8.
[4] 5 Am Jur 2d, Arbitration and Award §§ 98, 99.

3. The arbitration agreement form does not constitute a contract of adhesion.

Reversed and remanded.

CYNAR, J., concurred in the result.

1. ARBITRATION — MEDICAL MALPRACTICE — ARBITRATION PANELS.

An arbitration panel replaces a trial court in the resolution of medical malpractice disputes under the medical malpractice arbitration act; the losing party to an arbitration award is not entitled to *de novo* review or a trial subsequent to arbitration (MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.).*

2. ARBITRATION — MEDICAL MALPRACTICE — AGREEMENTS TO ARBITRATE.

An agreement to arbitrate as provided by the medical malpractice arbitration act is not a contract of adhesion or unconscionable (MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.).*

3. ARBITRATION — MEDICAL MALPRACTICE — ARBITRATION PANELS — DUE PROCESS.

A plaintiff's right to due process is violated when a medical malpractice arbitration panel must employ either a doctor or hospital administrator among its members because a hearing before an unbiased and partial decision-maker is basic to the concept of due process of law.

4. ARBITRATION — MEDICAL MALPRACTICE — ARBITRATION PANELS.

A medical malpractice arbitration panel member may be subject to challenge for cause where unusual community or professional pressures would unreasonably influence the objectivity of the panelist (MCL 600.5044[5]; MSA 27A.5044[5]).

*Lopatin, Miller, Freedman, Bluestone, Erlich & Rosen* (by *Steven G. Silverman),* for plaintiff.

*Moll, Desenberg, Bayer & Behrendt,* for defendant.

Before: N. J. KAUFMAN, P.J., and R. M. MAHER and CYNAR, JJ.

N. J. KAUFMAN, P.J. Plaintiff appeals as of right from the trial court's grant of accelerated judgment dismissing her medical malpractice action.

On April 1, 1977, defendant fitted plaintiff with an intrauterine device (IUD). On February 24,

1978, defendant performed a tubal ligation on plaintiff but failed to remove the IUD. The IUD subsequently became partially imbedded in the endometrium and plaintiff became ill with endometritis. Prior to the tubal ligation plaintiff signed an arbitration agreement form. See MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.* Defendant's motion for accelerated judgment was based on the effect of the arbitration agreement in depriving the court of subject matter jurisdiction.

The medical malpractice arbitration act, MCL 600.5040 *et seq.;* MSA 27A.5040 *et seq.,* was the legislative response to a perceived mounting crisis in the area of medical malpractice. The decade preceding the enactment of the statute saw a rapid rise in the cost of medical malpractice insurance combined with a decline in the availability of insurance. *E.g., Report of Secretary's Comm on Medical Malpractice,* Dep't of Health, Education and Welfare (1973), "Rise in Malpractice Claims Forces Look at Previous Scare", *Hospitals,* March 16, 1981, pp 85-90. Arbitration, it is believed, will provide an alternative decisional mechanism that will result in an overall reduction in malpractice costs.[1] Under the act, the arbitration panel re-

[1] The perceived cost reduction is attributed to the fact that arbitration is generally quicker than litigation, provides for more simplified evidentiary rules and results in a decision that is usually final. See "The Case for Arbitration", *Medical Malpractice: A Discussion of Alternative Compensation and Quality Control Systems,* The Center for the Study of Democratic Institutions, p 8. There is also a belief the lower decisional costs will make it feasible for attorneys to handle smaller cases for clients who in the past would have been unrepresented in the traditional tort system. *Id.,* pp 4, 8. Whether the goal of reduced costs can be obtained through arbitration remains to be seen. As the instant case reveals, the arbitration act has engendered litigation concerning the validity of the arbitration agreements themselves. See E. Griffin, MD, "Medical Arbitration Statute—Either Amend it or Repeal It", *Michigan Medicine: Journal of Michigan State Medical Society,* May, 1980, p 286. Moreover, additional legal questions loom over the arbitration statute—*i.e.,*—whether due process permits a parent or guardian to enter into an arbitration agree-

places the trial court in the resolution of medical malpractice disputes. The losing party to an arbitration award is not entitled to *de novo* review or a trial subsequent to arbitration. *Cf. State ex rel Strykowski v Wilkie,* 81 Wis 2d 491, 515; 261 NW2d 434 (1978), *Parker v Children's Hospital of Philadelphia,* 483 Pa 106; 394 A2d 932 (1978).

In this appeal, plaintiff contends that the agreement was invalid because: 1) the arbitration statute violates her due process right to a hearing before a fair and impartial tribunal by requiring that at least one member of the arbitration panel be a physician or hospital administrator;[2] 2) the agreement is unconscionable because its terms are beyond the comprehension and reasonable expectation of an ordinary person faced with prospective medical treatment or hospitalization; and 3) the agreement constituted a contract of adhesion.

These issues have previously been considered by panels of this Court. The panels have been unanimous in rejecting claims that the arbitration agreement form is unconscionable or an adhesion contract. *E.g., Brown v Siang,* 107 Mich App 91; 309 NW2d 575 (1981), *Morris v Metriyakool,* 107 Mich App 110; 309 NW2d 910 (1981), *Jackson v Detroit Memorial Hospital,* 110 Mich App 202; 312 NW2d 212 (1981), *Piskorski v Art Centre Hospital,*

---

ment on behalf of a child, whether an arbitration agreement is binding upon the estate of a deceased patient, whether and when a deceased patient's estate has authority to revoke an arbitration agreement and whether an arbitration agreement may act to bar the consortium claims of a patient's spouse.

[2] MCL 600.5044(2); MSA 27A.5044(2) provides:

"An arbitration under this chapter shall be heard by a panel of 3 arbitrators. One shall be an attorney who shall be the chairperson and shall have jurisdiction over prehearing procedures, 1 shall be a physician, preferably but not necessarily from the respondent's medical specialty, and the third shall be a person who is neither a doctor, lawyer, or representative of a hospital or insurance company. Where a case involves a hospital only, a hospital administrator may be substituted for a physician."

110 Mich App 22; 312 NW2d 160 (1981). We agree
that these claims are without merit. See *Cushman
v Frankel,* 111 Mich App 604; 314 NW2d 705
(1981). The question of whether the arbitration
statute violates a claimant's right to due process
because of the required makeup of the arbitration
panels has produced a split of opinion among
members of this Court. Compare *Brown v Siang,
supra, Morris v Metriyakool, supra, Brown v Con-
sidine,* 108 Mich App 504; 310 NW2d 441 (1981),
with *Jackson v Detroit Memorial Hospital, supra,
Piskorski v Art Centre Hospital, supra.* In *Cush-
man v Frankel, supra,* we took the position that no
due process violation exists. The *Cushman* opinion
concluded that the procedures written into the
arbitration statute to reduce bias among arbitra-
tion panel members sufficiently protected against
the danger of biased decision-making. Now, upon
further reflection and repeated consideration of
this issue, we are of the opinion that due process is
violated when a medical malpractice arbitration
panel must employ either a doctor or hospital
administrator among its members.

A hearing before an unbiased and impartial
decision-maker is basic to the concept of due pro-
cess of law. Thus, it has long been held that
judicial or quasi-judicial officers are disqualified by
their interest in the controversy before them. *Tu-
mey v Ohio,* 273 US 510, 522; 47 S Ct 437; 71 L Ed
749 (1927). In *Tumey,* the United States Supreme
Court held that a defendant convicted for violating
prohibition was denied due process of law where
the judge deciding his case had a pecuniary inter-
est in its outcome. The defendant was convicted
before a mayor's court that shared county-wide
jurisdiction over such offenses. In addition to his
regular salary, the mayor was compensated di-

rectly from the fees and costs that he assessed against convicted violators. Absent convictions, the mayor received no compensation for his services as judge. Moreover, a substantial portion of the fines levied contributed to the general finances of the mayor's village. The Court, through Chief Justice Taft, wrote:

"All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. *Wheeling v Black,* 25 W Va 266, 270. But it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." 273 US 522, 523.

The Court observed that, although there were certainly mayors whose judgment would not be affected by the pecuniary interest inherent in the system, due process could not be satisfied by an assumption that mayors who acted in a judicial capacity would stoically remain above self-interest. *Id.,* 532:

"Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused, denies the latter due process of law."

In *Tumey,* the mayor's court system offered a possible temptation because of the mayor's own pecuniary interest as well as his indirect interest

in maintaining the finances of the village. *Id.,* 532-541.

In *In re Murchison,* 349 US 133; 75 S Ct 623; 99 L Ed 942 (1955), the Supreme Court held that due process was violated where witnesses were adjudged in contempt for their conduct before a Michigan one-man grand jury by the same judge who sat as the one-man grand jury. The two witnesses were called to testify concerning suspected gambling in Detroit and the alleged bribery of police officers. The judge was convinced that one witness had committed perjury, while the second refused to testify without counsel present. Both were charged with contempt and ordered to appear and show cause why they should not be punished for criminal contempt. The judge rejected arguments by the witnesses that they were denied fair and impartial trial by being tried before him in spite of his grand jury role. The Supreme Court held that due process prohibited a judge from taking on the dual positions of complainant-prosecutor and adjudicator. The Court reasoned:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' *Tumey v Ohio,* 273 US 510, 532; 47 S Ct 437, 444; 71 L Ed 749; 50 ALR 1243. Such a stringent rule may sometimes bar

trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt v United States,* 348 US 11, 14; 75 S Ct 11, 13; 99 L Ed 11." 349 US 133, 136.

More recently, in *Ward v Village of Monroeville,* 409 US 57; 93 S Ct 80; 34 L Ed 2d 267 (1972), the Court reiterated that due process may be violated even when the interest of the decision-maker is less immediate than that examined in *Tumey.* There, a traffic offense conviction before a mayor's court was reversed where the mayor was responsible for village finances, and where a major part of those finances was derived from the fines, forfeitures, costs, and fees imposed by the mayor's court. The mayor in *Ward* did not share directly in the fees and costs obtained. The *Ward* Court indicated that the proper due process test from *Tumey* was "whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused * * *' ". 409 US 59, 60. See also *Gibson v Berryhill,* 411 US 564; 93 S Ct 1689; 36 L Ed 2d 488 (1973). Significantly, the Court refused to hold that the defendant's rights were sufficiently protected by a statutory provision allowing the disqualification of interested, biased, or prejudiced judges in specific cases. *Ward, supra,* 61.

The requisite of a fair and impartial decision-maker has conscientiously been adhered to by the Michigan Supreme Court. In *Glass v State Highway Comm'r,* 370 Mich 482; 122 NW2d 651 (1963), the Court held that a state highway employee had

a sufficient interest in the outcome of a condemnation necessity hearing so that due process prohibited him from conducting and presiding at the hearing where the desired condemnation was pursuant to a highway plan put forth by his superior. *Id.,* 486-487. In *Crampton v Dep't of State,* 395 Mich 347; 235 NW2d 352 (1975), the Supreme Court found that due process was violated by the presence of a police officer on a two-man driver's license revocation appeal board. The plaintiff's driver's license had initially been revoked under the implied consent law.[3] The Court concluded that it was impermissible for a police officer, otherwise entrusted with the responsibility for arrest and prosecution of violators, to adjudicate a dispute between a citizen and police officer.

"We do not suggest that police officers and prosecutors are not fair-minded. But they are deeply and personally involved in the fight against law violators. As law enforcement officials they are identified and aligned with the state as the adversary of the citizen who is charged with violation of the law. Their function and frame of reference may be expected to make them 'partisan to maintain' their own authority and that of their fellow officers. The risk that they will be unable to step out of their roles as full-time law enforcement officials and into the role of unbiased decisionmaker in a law enforcement dispute between a citizen and a police officer presents a probability of unfairness too high to be consitutionally tolerable." 395 Mich 347, 357-358. (Footnotes omitted.)[4]

The following principles may be derived from these cases. Due process is violated where a claim-

[3] MCL 257.625f; MSA 9.2325(6).

[4] *Crampton* expressly distinguished peer review of official misconduct and the adjudication of a dispute between a citizen and officer. *Id.,* 395 Mich 358, fn 2.

ant must appear before a decision-maker who has a "direct, personal, substantial pecuniary interest" in reaching a conclusion against the claimant. *Tumey v Ohio, supra, Crampton v Dep't of State, supra.* The fact that certain individuals would not be affected by the alleged interest does not resolve a claimed due process violation. *Tumey, supra, In re Murchison, supra.* A procedure which offers a "possible temptation to the average man as a judge to forget the burden of proof require" violates due process of law. *Tumey, supra, Murchison, supra, Ward v Monroeville, supra, Crampton, supra.* Likewise, a procedure which might lead the decision-maker "not to hold the balance nice, clear and true between" the parties also violates due process of law. *Tumey, supra, Murchison, supra, Ward, supra, Crampton, supra.* Although circumstances and relationships must be considered, what will constitute a prohibitive "interest in the outcome" cannot be defined with precision. Still, it is axiomatic that justice must satisfy the appearance of justice. *Murchison, supra, Glass v State Highway Comm'r, supra.* The pertinent issue is not whether a particular group or profession is or is not fair-minded, but whether the function and frame of reference of such persons may be expected to make them partisan to their fellows. *Crampton, supra.* Finally, a statutory provision allowing for disqualification for interest, bias or prejudice in specific cases will not protect a party from the more subtle threat of systematic bias. *Ward, supra.*

Consideration of these principles in the instant case leads to the conclusion that due process will not countenance the presence of a physician or hospital administrator on a medical malpractice arbitration panel. Certainly, it cannot be claimed that physicians or hospital administrators as a

whole are not a fair-minded group. Nonetheless, in the context of malpractice litigation, the frame of reference of members of the medical profession might be expected to produce partisan results. Stated alternatively, the position of a physician or hospital administrator on an arbitration panel offers a possible temptation to forget the burden of proof required.

Survey evidence of physician attitudes indicates that malpractice has been a growing concern. W. Pabst, "A Medical Opinion Survey of Physician's Attitudes on Medical Malpractice", Appendix, *Report of Secretary's Comm in Medical Malpractice, supra,* pp 83-86. In the *Pabst* survey, over 40% of the responding physicians felt that "the most effective technique for alleviating the malpractice problem" were "laws limiting such suits" or "reduced court judgments". *Id.* A more recent survey of Arizona physicians revealed that fully 75% felt that in "most malpractice suits, the physician is not at fault". Brown, "Arizona Physicians' Attitudes Toward Consumers, Physicians and Health Care", *Arizona Medicine,* March, 1980, pp 174-179. Perhaps more telling is the following excerpt of the statement of Dr. George Northrup to a Department of Health, Education and Welfare commission studying the malpractice problem:

"As a physician, I live in an aura of fear—fear of suit. Fear contributes to hostility and rarely contributes to constructive action. Medicine has some bad doctors and some bad health-care institutions. We are not proud of them, nor do we defend them, and we are concerned with the correction or elimination of that element. Some do not believe that we have this concern, but believe me it is true. It is my opinion that if this were to be corrected overnight, the professional liability problem would remain * * *

"The House of Medicine feels belabored. Medical

organizations are trying their best to overcome their deficiencies, but in my opinion, malpractice litigation is not the best incentive to improvement. It places medicine in an adversary position, and hostilities too often result * * *

"It may be hard to believe, but we are a frightened profession. The doctor feels put upon. He feels nude on the corner of the Main Street of life. He often tries to cover himself with pride, and even occasionally arrogance, only to find himself being castrated. He really doesn't want to believe the hostility he feels * * *. The faith of the patient is important to the patient and to his physician. Faith is a power, and the physician continually feels it is being eroded by sometimes justified and frequently unjustified attacks."[5]

Again, the danger is not that physicians and hosptial administrators are not fair-minded. There are undoubtedly members of the medical profession who would be unaffected as arbitrators by their professional interests. However, there is always the threat that those interests might lead such an arbitrator to fail to balance equally between the parties to arbitration. A major contributing factor to the threat of partisanship is the interrelation between malpractice verdicts and awards and the size of medical malpractice insurance premiums. In opposing defendant's motion for accelerated judgment, plaintiff filed a number of affidavits from insurance consultants concerning this issue.

An affidavit of Haig G. Neville indicated that insurance rates, with respect to both hospitals and doctors, are based to a substantial degree upon the traditional number of claims in a "rating jurisdiction". According to Neville, the State of Michigan comprises one rate jurisdiction, and, therefore, the

[5] *Report of Secretary's Comm on Medical Malpractice, Dep't of Health, Education and Welfare* (1973), pp 20, 105-108.

insurance rate for an individual doctor or single hospital is not contingent upon their own claim history, but rather upon the number of claims, settlements, and judgments against all other physicians and hospitals throughout the state. In a second affidavit, Duane LaMoreaux listed four factors that determined insurance rates: (a) actual loss experience; (b) reserves; (c) past experience within each classification; and (d) trend factors. LaMoreaux depicted the relationship between reserves and trend factors in the following manner:

"(a) as the claim size increases, the medical malpractice insurance carrier increases the size of its reserves on pending claims and such tends to increase the size of the reserves on future claims; (b) when the reserves are increased, rates are also increased; and (c) the individual effect of a single claim in the medical malpractice insurance area is direct and substantial given the relatively small number of claims and a relatively small number of insureds existing in the area of medical malpractice."

LaMoreaux also indicated that rates are promulgated upon a statewide basis and that although rates vary for particular classifications for specialties, a malpractice award against a physician would have a universal effect upon insurance costs.

Although the direct impact of a given malpractice case upon a single doctor's or hospital's insurance rate may well be minimal, the danger flowing from this inherent pecuniary interest cannot be ignored. The overall impact of malpractice claims and awards upon insurance rates is unquestioned. The threat from the interrelation between awards and the cost of insurance is that it may contribute to a subtle systematic bias in arbitrators chosen

from the medical profession. It is a relationship that offers a possible temptation to the average man as a decision-maker to forget the requisite burden of proof and which might lead a decision-maker to fail to hold the balance between the parties nice, clear, and true. *Tumey, supra, Ward, supra, Crampton, supra.*

Finally, we are not convinced that this type of systematic bias can be remedied by the procedural protection written into the arbitration statute. MCL 600.5044(3)-(5); MSA 27A.5044(3)-(5), MCL 600.5045; MSA 27A.5045. An arbitration panel member may be subject to challenge for cause where "*unusual* community or professional pressures *will* unreasonably influence the objectivity of the panelist". MCL 600.5044(5); MSA 27A.5044(5). (Emphasis added.) The danger, however, is not of unusual professional pressures that can be shown in a given case to unreasonably influence, but of a general frame of reference that may be expected to induce partisanship. The bottom line is that the arbitration statute mandates that an arbitration panel include among its members a physician or hospital administrator. The threatened systematic bias is ever present.

We conclude that the danger of partisanship by a doctor or hospital administrator serving on an arbitration panel is sufficient to violate due process standards requiring a fair and impartial decision-maker. We reverse the trial court's order of accelerated judgment and remand the matter for trial.

Reversed and remanded.

CYNAR, J., concurs in the result on the basis of *Gale v Providence Hospital,* 118 Mich App 405; — NW2d — (1982).