363 So.2d 1141 (1978)
Daniel BRYANT, Appellant,
v.
STATE of Florida, Appellee.
No. JJ-294.
District Court of Appeal of Florida, First District.
November 3, 1978.
Earl H. Archer, III, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., Charles W. Musgrove and Raymond L. Marky, Asst. Attys. Gen., for appellee.
*1142 BOYER, Judge.
This is an appeal from an order of contempt, and other related matters.
One James Neal entered a plea of guilty to leaving the scene of an accident involving personal injury and was placed on probation for five years. One of the conditions of probation was that he would not drive "for any purpose during the term of probation". Another condition was that he "in all respects live honorably, work diligently at a lawful occupation, and support dependents, if any, to the best of [his] ability, and live within what income is available * * ". Apparently Neal's drivers license was suspended but in due course, via some means not made clear by the record nor material here, his license was reissued to him by the Department of Motor Vehicles. On January 3, 1978, Neal and some 70 other parolees and probationers were transferred to appellant Bryant, a newly reassigned parole and probation officer, for supervision. The prior probation officer met with Bryant and personally introduced him to the persons he would be supervising. One of the persons they attempted to visit was Neal. He, however, was at work so they talked to his sister who indicated that Neal had found better employment in Gainesville and was driving to and from work. Bryant thereafter called Neal into his office and was then informed of the reissuance of the driver's license, Neal having stated that since the license was reissued he thought the condition of probation that he not drive had been lifted. Bryant told Neal that he might be in violation of his probation. However, he did not instruct Neal to continue nor discontinue driving, because he did not know whether it would "violate Neal's rights." Bryant was aware that the trial judge, on a prior occasion, had refused to modify the conditions of probation as to driving. Bryant informed Neal that he would investigate his case and that he would seek a modification of the court order if his investigation revealed the truth of the representations made to him by Neal. Bryant continued to phase into his new assignment. He contacted the Mental Health Clinic, the DWI School and Neal's employer. He learned that Neal had made a good adjustment, complied with the provisions of probation pertaining to abstention from alcohol and was a good employee. He also determined that it was essential to Neal's continued employment that he be permitted to drive. On February 3, 1978 Bryant attempted to make an appointment with the trial judge to talk about the Neal case but he was unable to arrange for an appointment until February 13. At that meeting Bryant related the findings of his investigation to the trial judge and asked if the judge would be inclined to modify the conditions of probation so as to allow Neal to drive to work. The judge declined. Bryant, on the next day, went to Neal's home to inform Neal of the judge's decision. Neal was not at home so Bryant talked with Neal's mother. Three days after having talked to the judge, Bryant physically took Neal's driver's license. On February 17, the trial judge issued a rule to show cause directing Bryant to show cause why he should not be held in contempt of court for indirect criminal contempt and sentenced accordingly. In due course an attorney was appointed to represent Bryant who requested a continuance and a jury trial. The trial was continued one day and the motion for a jury trial was denied. Another motion requesting the trial judge to recuse himself was also denied. When the hearing was commenced Bryant was directed by the trial judge to proceed with his defense although no evidence had been adduced by the state nor the trial judge. After Bryant testified the trial judge cross-examined him. The record reflects that the judge, without being under oath, dictated into the record his narrative concerning his recollection of what transpired when he and the defendant met on February 13. The trial judge refused to be examined by Bryant's attorney concerning his recollection testimony. Bryant was found to be in criminal contempt and an order of contempt was entered on March 1, 1978.
Examining the record, we find that Neal's order of probation was not directed to the Department of Offender Rehabilitation *1143 nor any of its employees, but only to Neal. Bryant could not, therefore, of course, be held in contempt for violation of that order. Indeed, the record reveals that the rule to show cause which formed the basis for the charge against Bryant only recited that he was aware of the provisions of the probation order; that his predecessor had sought modification so as to allow Neal to operate a motor vehicle for work purposes and that the court had declined such modification; that such declination was within the knowledge of Bryant and that Bryant "well knowing of the terms of the probationary order, and that its modification had been sought on a prior occasion by your predecessor in office, nonetheless did give the defendant verbal authorization to operate a motor vehicle to drive daily between his home in Williston, Levy County, Florida and his employment in Gainesville, Alachua County, Florida" and that Neal "has been operating a motor vehicle pursuant to your authorization but in controvention and direct violation of the order of probation".
Aside from the procedural matters which we will address in due course, it is apparent that in order for Bryant to have been validly found to be in contempt it was necessary that the charges against him, as above recited, be established by proof. The thrust of the charge is that Bryant gave verbal authorization to Neal to operate a motor vehicle contrary to the court's order and that Neal had been operating a motor vehicle pursuant to such authorization. We do not find proof of that charge in the record. Neal did not testify. Bryant specifically denied giving any such authorization or permission and there was no other evidence on the point. The record does reflect that Bryant was aware of the restriction and was aware that Neal was nevertheless driving. While he did not then and there direct Neal to discontinue driving neither did he give permission nor authorization. Bryant's testimony on the point was:
"Even though the order says that you are not to drive, and it looks like that you are in violation, I cannot proceed at this moment because I don't know that much about the case. Let me back off, and I am not going to take any action until I find out more about this situation. It is a likelihood that the court will not go along with a modification based upon your past driving record and the fact that he had already refused once; but I will attempt to seek a modification in this matter in order that you may keep your job."
Further, intent is one of the elements of contempt. Somerstein v. City of Miami Beach, 319 So.2d 158 (Fla. 3rd DCA 1975). There is no evidence of intent by Bryant to disobey the court's order in this case. Nor is there evidence that Bryant's alleged disobedience of the court order was willful. Bryant was a layman and did not understand the legal significance of the reissuance of Neal's driver's license. When the trial judge refused to modify the terms of Neal's probation as to the driving condition, Bryant immediately took Neal's driver's license. The record reveals no contempt. (Florida Ventilated Awning Company, Inc. v. Dickson, 67 So.2d 218 (Fla. 1953). Department of Health and Rehabilitative Services v. State, 338 So.2d 220 (Fla. 4th DCA 1976).)
In Pugliese v. Pugliese, 347 So.2d 422 (Fla. 1977) the Florida Supreme Court distinguished civil contempt from direct or indirect criminal contempt as follows:
"If the purpose of the proceedings is to coerce action or non-action by a party, the order of contempt is characterized as civil. This type contempt proceeding is ordinarily instituted by one of the parties to the litigation who seeks to coerce another party to perform or cease performing an act. The order of contempt is entered by the court for the private benefit of the offended party. Such orders, although imposing a jail sentence, classically provide for termination of the contemnor's sentence upon purging himself of the contempt. The sentence is usually indefinite and not for a fixed term. Consequently, it is said that the contemnor `carries the key to his cell in his own pocket.' [citations omitted]

*1144 "On the other hand, a criminal contempt proceeding is maintained solely and simply to vindicate the authority of the court or to punish otherwise for conduct offensive to the public in violation of an order of the court. Ex Parte Earman, 85 Fla. 297, 95 So. 755 (1923); Demetree v. State, supra. Accordingly, while the conduct in the case at bar could be the subject of civil contempt proceedings at the instance of the wife to coerce the petitioner to vacate the premises, it could also be the basis for criminal contempt proceedings in the event the trial court determined the conduct to be obstinate and sought simply to vindicate the authority of the court by punishing the petitioner. It is apparent then that the nature of the conduct is not determinative of the character of the order.
* * * * * *
"Where the act constituting the contempt is committed in the immediate presence of the court, this contempt is defined as direct. Where an act is committed out of the presence of the court, the proceeding to punish is for indirect (sometimes called constructive) contempt. * * *" (347 So.2d at pages 424 and 425.)
It is well recognized in Florida that greater procedural due process safeguards are accorded when one is accused of indirect criminal contempt. (Pugliese, supra.) The necessary procedure which must be followed in cases of indirect criminal contempt is set forth in Fla.R.Crim.P. 3.840. Subsection (a)(5) of that rule in particular provides the means for disqualification of a judge and states:
"Disqualification of Judge. If the contempt charged involves disrespect to or criticism of a judge he shall disqualify himself from presiding at the hearing. Another judge shall be designated by the Chief Justice of the Supreme Court."
Bryant has also raised as error the failure of the trial judge to recuse himself. Looking at the language of Rule 3.840(a)(5), we cannot say that this case falls within the parameters of that rule. Since the contempt charged in this case does not involve disrespect or criticism of a judge, the question arises as to whether or not the judge otherwise erred in failing to recuse himself.
A judge need not recuse himself simply because the contempt was committed against him or a court of which he is a member. Further, a judge generally is not disqualified merely because he initiated the contempt proceedings. This is particularly true in cases of direct criminal contempt where it is necessary for immediate and summary action on the part of the trial court or judge. (67 A.L.R.2d 600 Disqualification of Judge in proceedings to punish contempt against or involving himself or court of which he is a member. p. 600.)
However, there are exceptional cases wherein due process may be violated if a judge tries a contempt committed against himself or a contempt concerning disobedience to an order rendered by him. We deem this to be such a case.
The trial judge was not merely a witness in this case, he was the only witness against Bryant to prove a charge of contempt which occurred out of the presence of the court. Probationer Neal, who was the only witness to the alleged contempt besides Bryant was not even called as a witness at the trial. The judge testified without being under oath and refused to be cross-examined by counsel concerning his recollection of the meeting between himself and Bryant. In that regard it is instructive to look at the language found in In the Matters of Lee Roy Murchison and John White, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) in which review was sought of an adjudication of contempt where the same judge presiding at the contempt hearing also served as the "one-man grand jury" out of which the contempt charge arose. There the Supreme Court stated:
"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own *1145 case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that `every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way `justice must satisfy the appearance of justice.' Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11.
* * * * * *
"As a practical matter it is difficult if not impossible for a judge to free himself from the influence of what took place in his `grand-jury' secret session. His recollection of that is likely to weigh far more heavily with him than any testimony given in the open hearings. That it sometimes does is illustrated by an incident which occurred in White's case. In finding White guilty of contempt the trial judge said, `there is one thing the record does not show, and that was Mr. White's attitude, and I must say that his attitude was almost insolent in the manner in which he answered questions and in his attitude upon the witness stand ... Not only was the personal attitude insolent, but it was defiant, and I want to put that on the record.' In answer to defense counsel's motion to strike these statements because they were not part of the original record the judge said, `That is something ... that wouldn't appear on the record, but it would be very evident to the court.' Thus the judge whom due process requires to be impartial in weighing the evidence presented before him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression, the accuracy of which could not be tested by adequate cross-examination.
* * * * * *
"Moreover, as shown by the judge's statement here, a `judge-grand jury' might himself many times be a very material witness in a later trial for contempt. If the charge should be heard before that judge, the result would be either that the defendant must be deprived of examining or cross-examining him or else there would be the spectacle of the trial judge presenting testimony upon which he must finally pass in determining the guilt or innocence of the defendant. In either event the State would have the benefit of the judge's personal knowledge while the accused would be denied an effective opportunity to cross-examine. The right of a defendant to examine and cross-examine witnesses is too essential to a fair trial to have that right jeopardized in such way.
"We hold that it was a violation of due process for the `judge-grand jury' to try these petitioners, and it was therefore error for the Supreme Court of Michigan to uphold the convictions. * * *" (349 U.S. at page 136, 75 S.Ct. at page 625.)
As in the above quoted case, this case is distinguishable from an adjudication by a trial judge of a contempt committed in his immediate presence in open court. In cases of direct criminal contempt it may be necessary that the affronted judge act summarily and adjudge the contemnor in contempt in order to preserve the integrity of the court. But that necessity is lacking in cases of indirect or constructive contempt, and indeed due process requires that in cases such as this that the contempt be tried by another tribunal.
In Ex Parte Turner, et al., 73 Fla. 360, 74 So. 314 (1917) and Dixon v. State, 155 So.2d 632 (Fla. 2nd DCA 1963) it was held that matters relating to a prisoner serving under sentence of a court are regulated by statute, not by judicial orders, and that interference *1146 therewith is not a contempt of the court. Whether a probationer pursuant to court order constitutes an exception, or whether a probation officer (because of his peculiar relationship to the court) is an exception, are questions which have not been raised nor argued in the briefs: Because of our disposition of the case on other grounds we find it unnecessary to address them here.
The order of contempt here appealed is
REVERSED.
McCORD, C.J., and MILLS, J., concur.