*913 OPINION OF THE COURT
Bruce McM. Wright, J.
In this petition which seeks, inter alia, a writ of prohibition and declaratory relief, the core issue posed by petitioner is whether the Board of the Triborough Bridge & Tunnel Authority has the right and power to impose upon petitioner a collective bargaining settlement when an impasse is reached in negotiations.
In arguing that the signing of a collective bargaining agreement after the existence of a long impasse does not conclude matters or resolve the underlying dispute between the parties, petitioner concedes that the agreement was indeed signed, but that:
"It is unfair and untrue to represent to this court the fact that by having the union enter into a collective bargaining agreement that the entire issue submitted * * * has become moot.
"The actions of respondents in not only refusing to bargain in good faith but also attempting to impose a contract upon the union, had forced the union and its membership to accept a contract which was slanted towards and heavily favored the Authority.
"The membership having worked almost two years without the benefit of a contract had no choice but to 'cave in’ and accept the contract that was offered.”
The issue of whether or not respondents can properly impose a settlement where the negotiating parties reach an impasse is an issue that remains unresolved by the execution of the collective bargaining agreement. If the issue is not resolved at this point and started on its way through the appellate courts, it will simply crop up again, like a troubling Banquo’s Ghost.
The issues drawn by the motion papers and those opposed will be engaged.
Petitioner moves to enjoin respondents from adopting the status of a "legislative body” with jurisdiction to resolve the labor dispute that exists between the parties, after conducting a hearing. One consequence of such adoption and hearing would be the imposition upon petitioner’s membership of a labor contract. In that connection, a declaratory judgment is sought declaring that the respondent Triborough Bridge & Tunnel Authority is not a legislative body with jurisdiction to resolve a labor dispute by imposing upon petitioner’s membership an agreement, once an impasse in negotiations exists.
*914 In the alternative, petitioner moves for an injunction enjoining respondents from submitting the existing labor dispute to "the legislative body”, on the theory that any such submission is time barred.
The single issue to be determined here, in view of the signing of the labor agreement is whether or not, in the event of an impasse in negotiations, the Board of the Triborough Bridge & Tunnel Authority is the "legislative body” authorized to resolve deadlocked negotiations, or what is meant is the New York State Legislature (presumably, the Senate and Assembly acting together). Petitioner wishes to have stalled labor disputes referred to those two bodies, accompanied by respondents’ recommendations for resolution, pursuant to Civil Service Law § 209 (3) (e).
Since petitioner takes the position that the union membership was forced to "cave in”, the matter was not resolved by the Triborough Board; that is, officially, at least, nothing was "imposed” upon the petitioner’s membership.
[I] the petition:
Petitioner is a not-for-profit labor union and the collective bargaining agent for its members who are employees of the respondent Triborough. The respondent Kiley, as chairman of the respondent Metropolitan Transportation Authority and as chief executive officer of Triborough, has full authority to negotiate collective bargaining agreements with petitioner, along with Triborough’s executive officers.
A former collective bargaining agreement expired on August 30, 1984, and petitioner’s membership has, since that time, worked without a contract. Negotiations began in 1983, prior to the expiration date of the old agreement. Both sides concurred, as of the time the motion was submitted that, pursuant to Civil Service Law § 209 (the Fair Employment Act), an impasse existed in negotiations.
Still, acting pursuant to the Civil Service Law, the Public Employment Relations Board (PERB) appointed a fact-finding board to aid in resolving the impasse in negotiations. One Philip J. Ruffo was appointed as fact finder. His report was issued under date of November 27, 1985. His findings of fact and recommendations pursuant to Civil Service Law § 209 (3) (b) and (c) covers some 72 pages of detailed discussion and recommendations.
On January 2, 1986, respondents refused to accept the fact *915 finder’s recommendations. Thereafter, respondents scheduled a hearing to be convened before the respondent Metropolitan Transportation Authority (MTA) for the purpose of settling the dispute, by imposing upon the petitioner’s membership a new collective bargaining contract. Respondents purported to act under Civil Service Law § 209 (3) (e). That section provides, in relevant part, that, where a fact finders recommendations are rejected, for the purpose of resolving collective bargaining disputes, "the chief executive officer of the government involved shall * * * submit to the legislative body of the government involved a copy of the findings of fact and recommendations of the fact-finding board, together with his recommendations for settling the dispute”.
The employee organization may submit its recommendations for resolving the dispute "to such legislative body” and the latter must "forthwith conduct a public hearing”, at which all parties have an opportunity to "explain their positions” (Civil Service Law § 209 [3] [e] [ii], [iii]). "[Thereafter, the legislative body shall take such action as it deems to be in the public interest, including the interest of the public employees involved” (Civil Service Law § 209 [3] [e] [iv]).
Petitioner, fearful that "the legislative body” dominated by the respondents would force upon petitioner’s membership a contract that would destroy the meaning of the term "collective bargaining”, moved to stay the public hearing and, pending the argument and determination of the petitioner’s motion, that public hearing was stayed.
The central question the court has been asked to resolve is the meaning of the term "legislative body”. Petitioner argues that it can only mean the New York State Assembly and the Senate. Respondents contend that it means the legislative body of the MTA. Petitioner sees jeopardy to the collective bargaining process in recognizing the MTA Board as the legislative body intended by Civil Service Law § 209 (e). It is true that the chairman of the MTA is also the chairman of the Triborough Bridge & Tunnel Authority under Public Authorities Law § 552 (1). The executive director of both is also George Schoepfer. The result, according to petitioner, is that when an impasse results in negotiations, respondents have the power to force a settlement. Thus, all respondents need do is disagree with a fact finder’s recommendations and the machinery exists to end collective bargaining and conclude matters by dictating a contract. Of course, that is oversimplification, since the law plainly states that any such *916 resolution by the "legislative body” shall follow a public hearing and whatever action it takes shall be that which it "deems to be in the public interest, including the interest of the public employees involved” (Civil Service Law § 209 [3] [e]).
Viewed in any light, however, there is reserved to "the legislative body” the power to make a contract and force it upon petitioner’s membership.
Is the Board of the MTA-TBTA the "legislative body” intended by the statute, or is the legislative body referred to the Assembly and Senate of the State?
The statute says "the Legislative body of the government involved”. It seems clear that "the government involved” is the Board of the respondent authorities. It is equally clear that the State’s legislative body is not "involved”, other than its past enactment of the Civil Service Law. If this is so, petitioner argues, then Civil Service Law § 209 (3) (e) is unconstitutional as in violation of employees’ rights to organize and bargain collectively.
Curiously, the moving papers, while seeking a declaratory judgment declaring that the New York State Legislature is the legislative body with jurisdiction to resolve disputes at impasse in their negotiation, do not engage the issue of constitutionality with any zeal or fervor.
The present contretemps parallels, in some ways, the problems raised in Wolkenstein v Reville (694 F2d 35, cert denied 462 US 1105). There, the issue involved the Taylor Law (Civil Service Law § 210), a statute that prohibits strikes by public employees. When there is a strike of such employees, "The 'chief executive officer’ of the governmental unit involved is empowered to determine, 'on the basis of such investigation and affidavits as he may deem appropriate’, whether an illegal strike has occurred and which employees have participated” (supra, pp 36-37). On the basis of his findings, an employee may be punished by that same chief executive officer. In Wolkenstein (supra), the employees charged that the chief executive by being the Judge in his own case, deprived them of due process. And what the petitioner is saying here, in effect, is that no person shall be Judge in a case the outcome of which he has an interest. In Tumey v Ohio (273 US 510), the Mayor of a small village presided over a so-called "Liquor Court” that tried offenses and imposed fines and court costs. In addition to his regular salary the Mayor retained the costs *917 imposed. This was held to violate due process because the Mayor "as an individual” (p 535) had a "direct, personal pecuniary interest” (p 523) in the costs collected after he had convicted someone. Given the ordinance under which he functioned, the Mayor was said to have had a strong "official motive to convict and to graduate the fine to help the financial needs of the village” (supra, p 535). Indeed, the Mayor was responsible for the village money needs.
Following Tumey (supra) came Dugan v Ohio (277 US 61). There, the Mayor of Xenia, Ohio, a salaried official, tried offenders and convicted them, but he did not share in the costs collected or the fines imposed. The Mayor of Xenia, however, was not responsible for the financial needs of the city.
In the case at bar, while the respondents are obviously interested in operating the MTA and the TBTA in the most efficient and money-making manner for their bondholders and achieving savings realized by an economically favorable labor agreement, it does not appear that any of the respondents would share in savings beyond respective salaries.
Rather strangely, perhaps, the Second Circuit, in Wolkenstein (supra, p 41) could write that, "due process demands strict impartiality on the part of those who function in a judicial or quasi-judicial capacity. Nevertheless, the [Supreme] Court has made clear on several occasions that administrators serving as adjudicators are presumed to be unbiased.” It seems a rather generous and liberal assumption to believe that the respondents, locked in a long and extended labor dispute with the petitioner’s membership, brought to the negotiating table an impartial and unbiased attitude. Today, as in the past, there remains the classic confrontation between labor and management, with "sweetheart” arrangements being more the exception than the rule — despite the seeming big business existence of large and international unions and the salaries their executives are paid.
Still, the respondents themselves are employees, although doubtless infused with an executive’s attitude towards the kind of efficiency and economy in management that commends their retention to the board that employs them. The presumption of their impartiality, of course, is rebuttable, according to Wolkenstein (supra, p 42) "by a showing of disqualifying interest, either pecuniary * * * or institutional * * * But the burden of establishing a disqualifying interest rests on the party making the assertion.”
*918 Here, respondents have made a kind of adjudicatory determination that they are the "legislative body” intended by the statute and that they had the right to impose a settlement of the labor dispute between the parties. And, in effect, petitioner argues that, despite the execution of a new collective bargaining agreement, it was, in effect, imposed upon the union’s membership. But, it is conceded that a 1980 lawsuit that might have engaged the same nettlesome issues as those raised here, was voluntarily discontinued by the petitioner.
Although there are conclusory assertions that respondents have negotiated in bad faith and that petitioner may anticipate the same kind of hard-nosed attitude when the present agreement expires in what petitioner’s counsel describes as "one short year”, these contentions are not buttressed by evidentiary detail. Thus, they impress as conclusory. " 'Bald conclusory assertions, even if believable, are not enough.’ ” (Ehrlich v American Moninger Greenhouse Mfg. Corp., 26 NY2d 255, 259.)
And, in the words of the Court of Appeals: "This court has frequently pointed out that 'insufficient evidence is, in the eye of the law, no evidence.’ ” (Blum v Fresh Grown Preserve Corp., 292 NY 241, 245.)
There are several hard facts here that the court may not ignore. First, the present situation, where petitioner is vulnerable to what is called a "dictated contract”, is one that has existed for over 20 years. It is described as wrong and this court is asked to "right the wrong” of permitting respondents to force union membership "through economic strangulation, to succumb to the wishes and needs of their families”, while accepting a pact that cannot be called properly a negotiated agreement.
But, is it within the power of the court to rescue petitioner’s membership? The answer, at this juncture, must be a no. Ironically, the very statute that allows respondents their dictate is characterized as a "Fair Employment Act”. The act, Civil Service Law § 209 (3) (e), permits the respondents to "consider” the findings of fact and recommendations of the fact finder, but tolerates "the board” to "take whatever steps it deems appropriate” to resolve a labor dispute. This is an investment of wide-ranging discretion.
Had the respondents compelled an agreement dictated by them early along, instead of conducting negotiations since 1983, prior to and after expiration of the 1984 agreement, *919 some abuse of power may have been perceived. Some suggestion of an abuse of discretion might be suggested by the apparent rejection of a highly detailed, lengthy and exhaustive fact finder’s report, but a suggestion is not hard evidence. And it is the protection of judicial review that theoretically, at least, assures oversight to determine whether or not there has been administrative due process.
Petitioner has not made a case supporting caprice, arbitrariness or abuse of discretion. What does emerge from the competing papers is that respondents did precisely what the Fair Employment Act allows them to do.
The source of petitioner’s problem is legislation and the Legislature. It is the Legislature that created the respondent Authorities and it lies with the Legislature to make the kinds of changes in the law that petitioner would like to see. It is not the province of this court to legislate. While the legislation as it now exists allows a potential for managerial abuse and dictatorial consequences, it has not been demonstrated in the papers before the court that that is the case at hand.
Finally, the term "legislative body”, as used in Civil Service Law § 209 leaves no doubt that it means the governing body of the respondent Authorities. Paragraph (e) of subdivision (3), for example, speaks of the "chief executive officer of the government involved”, not the State government and not the Governor. Despite prior discussion in this decision, it is restricted to the meaning of the term "legislative body of the government involved”. Clearly, the "government involved” is the government of the respondent Authorities, and it is so concluded.
By reason of the execution by the parties of a labor agreement, as both sides advise the court, the request by petitioner for a writ of prohibition enjoining the respondent Authorities from conducting a hearing, is denied as moot.
That branch of the motion seeking a declaratory judgment, ruling that the respondent Metropolitan Transportation Authority is not a legislative body for the purposes of Civil Service Law § 209 (3) (e) is denied and, consequently, the request that the court declare that the New York State Legislature is the legislative body with jurisdiction to resolve any impasse in collective bargaining negotiations between the parties is also denied.
Whether or not a time bar would have prevented respondents from submitting the now resolved labor dispute to the *920 legislative body has been rendered moot by the signing of a new collective bargaining agreement. There is, accordingly, no necessity to rule on a time-bar argument.
That branch of the petitioner’s application seeking an order directing that the differences between the parties be submitted to the New York State Legislature is denied, in view of the determination that that body is not the legislative one intended and meant under the Fair Employment Act.
Since the collective bargaining accord was reached before respondents acted to turn over the dispute "to itself or the MTA”, that branch of the plural application is denied.
In view of the fact that petitioner will be offended by the present definition of "legislative body” and the identical problem that led the parties to this court will crop up in the next round of labor negotiations, it seems advisable for petitioner to press its forthwith appeal from the determination here.