CORRIGAN, J.
I would not resolve the recusal motion of defendant Michigan Catastrophic Claims Association (MCCA) at this time. Rather, I would order supplemental briefing of the application of Caperton v A T Massey Coal Co, Inc, 556 US _; 129 S Ct 2252; 173 L Ed 2d 1208 (2009) (Caperton), to these cases. Caperton addressed the disqualification of a judge when a party alleges that the judge’s interest in a case requires recusal under the Due Process Clause of the federal *50 constitution. To weigh whether recusal is required, Caperton requires an assessment of whether a serious, objective risk of actual bias exists that requires the judge to recuse himself or herself. Because the MCCA argues that Justice Hathaway’s participation in these cases violates its federal due process rights, Caperton is relevant and could prove controlling. Indeed, the MCCA has submitted Caperton to this Court as supplemental authority in support of its motion.
The scope of Caperton and how courts will implement it present significant unanswered questions, particularly for our Court. Caperton held that a state supreme court justice was disqualified from hearing a case involving a corporate party whose chairman and CEO had expended $3 million to support the justice’s campaign, although the individual expended this money independently and through donations to an independent political group. Caperton, 129 S Ct at 2257. The Court concluded that the justice was disqualified although he professed that the funds were solicited and expended without his knowledge, direction, or control under state election laws very similar to our own. See Caperton v A T Massey Coal Co, Inc, 223 W Va 624, 703-705; 679 SE2d 223 (2008) (W Va Caperton.) (Benjamin, acting C.J., concurring). Indeed, Michigan allows independent political groups to expend unlimited money during elections, often without being required even to reveal their funding sources.* [1] For example, during the 2008 election cycle, independent *51 expenditures aimed at the race for Justice HATHAWAY’s current seat on this Court topped $3.75 million.* [2]
For these reasons, in my view, deciding the MCCA’s recusal motion within days of Caperton is precipitous. Caperton was released on June 8, 2009. We have hardly had time to digest the opinion, much less its ramifications, particularly given that the opinion is positively Delphic in explaining the standards for courts attempting to implement it. Four justices of this Court now vote, without any explanation or the benefit of fact-finding, to support Justice HATHAWAY’s decision to participate in these cases. Thus, although we have had little time to study Caperton and do not have the benefit *52 of briefing on it, the Court proceeds essentially to hold that such a vote is a mandatory procedure for all recusal motions raising due process concerns.[3]
THE MCCA’S MOTION FOR RECUSAL
The most relevant aspects of the MCCA’s motion follow. After this Court issued its March 2009 decision to grant reconsideration[4] of its December 2008 decision,[5] occasioned by newly elected Justice HATHAWAY’s partici *53 pation in these cases, the MCCA moved for her recusal. Specifically, the MCCA argues that Justice HATHAWAY’s husband, Michael Kingsley, has an interest that could be substantially affected by the outcome of the proceedings because he is a practicing plaintiffs’ no-fault attorney in Michigan. As such, he has a direct interest that is more than de minimis in the MCCA’s unlimited obligations to reimburse insurers for personal protection insurance benefits paid to insureds who have been catastrophically injured in automobile accidents.[6] The MCCA further asserts that it reimburses insurers for payments made to Kingsley’s clients, having made such *54 a reimbursement as recently as April 9, 2009.* [7] The MCCA’s obligation to reimburse insurers — and the potential resulting benefits to plaintiffs’ attorneys — is directly at issue in these cases. Indeed, the MCCA asserts that it has raised the amounts needed to pay expected claims and its reserves by almost $694 million in anticipation of this Court’s likely reversal on rehearing of its prior decision, stemming from the participation of newly elected Justice HATHAWAY in the decision after rehearing. The MCCA further states that this increase is the primary cause of the 19 percent increase in its assessments for catastrophic coverage this year, which affects all no-fault insurance policy holders’ rates. The MCCA claims that if, on rehearing, this Court prohibits the MCCA from engaging in a “reasonableness” inquiry, see n 6 of this statement, attorneys will reap the rewards at the expense of Michigan drivers, whose insurance rates will rise to support the resulting increased systemic costs.[8]
*55 THE CAPERTON DECISION
In Caperton, the United States Supreme Court “underscore[d] the need for objective rules” and asserted that the Due Process Clause requires recusal motions to be decided “by objective standards that do not require proof of actual bias.” Caperton, 129 S Ct at 2263. In concluding that recently elected West Virginia Supreme Court of Appeals Justice Brent Benjamin was disqualified from hearing the underlying case as a result of substantial campaign expenditures by the chairman, CEO, and president of the respondent company, A. T. Massey Coal Co., Inc., the Court held that “[d]ue process requires an objective inquiry” to establish whether the circumstances “ ‘would offer a possible temptation to the average... judge to ... lead him not to hold the balance nice, clear and true.’ ” Id. at 2264, quoting Tumey v Ohio, 273 US 510, 532 (1927). Significantly, the Court thus considered the purported facts underlying the motion for recusal, see Caperton, 129 S Ct at 2264,[9] and concluded, on the basis of its assessment of those facts, that “there was... a serious, objective risk of actual bias,” id. at 2265.
QUESTIONS RAISED BY CAPERTON
In light of the Caperton opinion, I do not think that we can resolve the MCCA’s recusal motion — which squarely raises due process concerns — without first addressing the following questions:
• Does this Court’s historical recusal practice— which permits each justice to decide motions for his or her recusal and which Justice HATHAWAY follows here— comport with the Caperton Court’s requirement for objective standards? Justice HATHAWAY states: “[N]either I nor any member of my immediate family has any *56 real or arguable financial interest in this case. The allegations made by the MCCA are not a basis for recusal because there is no appearance of impropriety and no due process violation.” Ante at 47. She adds: “Given [the Caperton] test, I find no arguable due process violation in the cases before me. There is nothing alleged by the MCCA that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me under any objective analysis.” Ante at 46. But the challenged justice in Caperton issued similar statements in which he declined to recuse himself, explaining that the moving party had provided no objective evidence of actual bias and expressing his subjective opinion that none of his motives were improper. Caperton, 129 S Ct at 2262-2263. Indeed, West Virginia’s recusal rules are strikingly similar to the practice followed by this Court. See W Va Caperton, supra at 702. Like Justice HATHAWAY — albeit while providing extensive factual detail concerning the allegations against him and legal precedent on the subject of recusal— Justice Benjamin asserted: “I have no pecuniary interest in the outcome of this matter. ... I have no personal involvement with nor harbor any personal antipathy toward any party or counsel herein.” Id. at 697. He added: “[N]o improper act or conduct, and no appearance of an improper act or conduct with respect to this case, or any other case, has occurred on my part[.]” Id. at 701. “Simply put, I do not have, nor was there any evidence to show that I had a ‘direct, personal, substantial, pecuniary interest’ in this case.” Id. at 702. Yet the United States Supreme Court concluded that his subjective assertions that he lacked actual bias were insufficient for constitutional purposes. Caperton, 129 S Ct at 2263. Particularly in light of the similarities between Michigan’s and West Virginia’s recusal *57 practices — indeed, in both states recusal decisions have been left to the discretion of the individual justice whose recusal is sought, W Va Caperton, supra at 702 — I simply cannot conclude without further study that the historic practice followed by Justice HATHAWAY today complies with Caperton. Nor can I conclude that Justice HATHAWAY may conclusively disavow any similarity to the facts of Caperton by simply offering her own opinion that “[t]here is nothing alleged by the MCCA that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me under any objective analysis.” Ante at 46.
• Is it sufficient under Caperton that four justices of this Court have voted to support Justice HATHAWAY’s decision here? Although Caperton expressly failed to address a proper method for fact-finding, the Court reached its decision by carefully considering the facts surrounding Justice Benjamin’s election. Here the MCCA alleges that Justice HATHAWAY must recuse herself because her husband has more than a de minimis financial interest in the subject matter of these cases. The MCCA points to very recent payments it has just made to one of Mr. Kingsley’s clients. It also alleges that it has raised the amounts needed to pay expected claims and its reserves by $693.8 million in anticipation of this Court’s potential reversal on rehearing of its earlier ruling in these cases; it states that the rate hike will be necessary because, if we reverse, claimants such as Mr. Kingsley’s clients will receive substantially higher payments — which result in higher attorney contingency fees — because insurers will have no legal basis for resisting unreasonable settlement demands made by plaintiffs’ attorneys. Can we possibly decide whether these alleged facts establish that “ ‘the probability of actual bias on the part of [Justice HATHAWAY] is too high to be constitutionally tolerable’ ” without first engaging in some kind of independent inquiry to test the claim *58 and Justice Hathaway’s summary denial of it?[10] See Caperton, 129 S Ct at 2257, quoting Withrow v Larkin, 421 US 35, 47 (1975).
I raise these concerns in part in light of the dissent filed by Chief Justice Roberts in Caperton. He asks, among *59 40 questions, whether — although a justice does not have an actual financial interest in the case — a litigant may challenge the justice’s refusal to recuse himself or herself in federal district court under 42 USC 1983,[11] *60 which permits a person deprived of a federal right by a state official to sue for damages. Caperton, 129 S Ct at 2271 (Roberts, C.J., dissenting). He also reasonably asks whether the parties are “entitled to discovery with respect to the judge’s recusal decision” and, “ [i]f a judge erroneously fails to recuse, do we apply harmless-error review?” Id. at 2271-2272. As he suggests, the ramifications of Caperton are broad. This Court should seriously consider how to properly dispose of a “Caperton claim”[12] alleging that the probability of a justice’s bias disqualifies that justice under the Due Process Clause.
I would thus invite thorough supplemental briefing on these significant issues before disposing of the MCCA’s recusal motion. Because the majority has chosen to precipitously resolve this disqualification motion, I dissent.

 The Michigan Campaign Finance Act, MCL 169.201 et seg., does not regulate certain expenditures, including those “for communication on a subject or issue if the communication does not support or oppose a ballot question or candidate by name or clear inference.” MCL 169.206(2)(b). See also Right to Life of Michigan, Inc v Miller, 23 F Supp 2d 766, 767 (WD Mich, 1998), quoting Buckley v Valeo, 424 US 1, 44 & n 52 (1976) (observing that Michigan is prohibited from *51 regulating speech protected by the “express advocacy” test established in Buckley, which permits regulation only of “communications that ‘in express terms advocate the election or defeat of a clearly identified candidate,’ ” such as those employing “ ‘express words of advocacy of election or defeat, such as “vote for,” “elect,” “support,” “cast your ballot for,” “Smith for Congress,” “vote against,” “defeat,” “reject” ’ ”); Planned Parenthood Affiliates of Michigan, Inc v Miller, 21 F Supp 2d 740, 745 (ED Mich, 1998) (noting that Michigan is prohibited under Buckley from regulating “issue advocacy”). Therefore, in practice, many major expenditures, including those for television ads, are not covered by our reporting laws. See Michigan Campaign Finance Network, 2008 Citizen’s Guide to Michigan Campaign Finance, p 14 <http://www.mcfn.org/pdfs/reports/MCFNCitGuide08.pdf> (accessed June 18, 2009) (hereinafter “MCFN Citizen’s Guide”) (“[Ajdvertisements that define!] the character and qualifications of the candidates without explicitly exhorting a vote for or against either candidate” are “not considered to be campaign expenditures and the sources of money that paid for the ads are not required to be disclosed.”). Accordingly, although a major expenditure may ultimately benefit a candidate, the expenditure — and its funding sources — may he outside the candidate’s awareness and control. Further, even regulated “independent expenditures” by third parties, which must be reported if they support a candidate, must be made without the direction or control of the candidate. MCL 169.209(2); MCL 169.251.

 MCFN Citizen’s Guide, p 14; see also Michigan Campaign Finance Network, Anonymous donors dominated Supreme Court campaign, November 19, 2008 <htfp://www.mcfn.org/press.php?prId=77> (accessed June 18, 2009) (“More than 60 percent of spending for the Michigan Supreme Court campaign between incumbent Chief Justice Clifford Taylor and Judge Diane Marie Hathaway will not be disclosed in any campaign finance report because it paid for candidate-focused ‘issue’ advertising.”).

 This occurs although Caperton has sparked much debate concerning its application. For example, Michigan Lawyers Weekly quoted former Michigan State Supreme Court Chief Justice Clifford Taylor as stating that Caperton “ ‘has to mean that the challenged justice can’t make the recusal decision alone.’ ” MSC recusal rule may not be constitutional, Michigan Lawyers Weekly, June 15, 2009, p 23. Chief Justice Kelly also asserted, in a recent press release, that Caperton “ ‘signals that we do need to have appropriate protections in place’ ” and “will assist the Michigan Supreme Court as it develops its own disqualification rules for justices.” Michigan Supreme Court, Office of Public Information, Caperton ruling by U.S. Supreme Court highlights importance of fair and impartial justice, says Michigan Supreme Court Chief Justice Marilyn Kelly, June 9, 2009 <http://courts.michigan.gov/supremecourt/Press/060909-CapertonDQ.pdf> (accessed June 18, 2009). Wayne County Assistant Prosecuting Attorney Timothy Baughman, on the other hand, “[rjespectfully” but “heartily” disagreed with former Chief Justice Taylor’s comments, asserting in a Michigan Lawyers Weekly Viewpoint comment:
Caperton is a case about standards and not about the identity of the decision-maker....
Nothing in Caperton requires that the decision on a recusal motion be reviewed by another justice or body of justices. For the Michigan Supreme Court [to continue] to follow the practice of the U.S. Supreme Court is perfectly permissible, so long as a system of “objective rules” exists. ['Caperton’ was about recusal standards, not decision maker, Michigan Lawyers Weekly, June 22, 2009, p 7.]

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 483 Mich 918 (2009).

 United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 482 Mich 414 (2008).

 The MCCA has an unlimited statutory obligation to reimburse insurers for 100 percent of claims paid to insureds whose losses due to personal injury exceed certain statutory caps; the current cap is $460,000. MCL 500.3104(2)(i) and (7)(a). As is further explained by Justice YOUNG, post at 62, the MCCA asserts that reversal of this Court’s prior opinion on rehearing will require the MCCA to reimburse all benefits paid by insurers to their catastrophically injured insureds, without regard to the reasonableness of the insured’s underlying expenditures. Accordingly, the MCCA states that its insurer members will have little incentive to defend unreasonable claims by their insureds; no matter how unreasonable the expenditure — at issue in one of these cases, for example, are an insured’s expenditures of $54.84 an hour for attendant care services — if the insurer accepts its insured’s claim, the MCCA will be obligated to reimburse the insurer in full. The MCCA asserts: ‘With a guarantee of MCCA reimbursement, coupled with the lure of saving legal defense costs, members will have a strong motive to settle [personal protection insurance] claims early and with little or no resistance.” It concludes: “This directly benefits lawyers like Mr. Kingsley who represent plaintiffs in no-fault automobile insurance cases, and who typically receive their fees out of the proceeds of settlements.” To illustrate, the MCCA has provided a hypothetical conversation between a future plaintiff’s attorney and an insurer:
[Attorney]: “I know that amount is a bit high for attendant care, but that is what we want. We’ll sue to get it and we’ll seek attorney fees and penalties too. [See MCL 500.3148(1).] Do you want that?”
Insurer: “Of course not, but that amount is unreasonable.”
[Attorney]: “What does reasonable have to do with it? [The] MCCA has to pay you regardless. Do you want to incur three times that amount in attorney fees instead?”
*54 Insurer: “Of course not.”

 MCR 2.003(B)(5) provides in part that a judge is disqualified from hearing a case if “the judge’s spouse ... has an economic interest in the subject matter in controversy... or has any other more than de minimis interest that could be substantially affected by the proceeding.” MCR 2.003(B)(6)(c) also provides that a judge is disqualified if the “judge or the judge’s spouse ... is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding!.]” Similarly, the United States Supreme Court requires recusal with regard to a justice’s spouse if “ ‘the amount of the relative’s compensation could be substantially affected by the outcome’____” See Adair v Michigan, 474 Mich 1027, 1031 (2006) (statement of Taylor, C.J., and Markman, J.), quoting the United States Supreme Court’s Statement of Recusal Policy, November 1, 1993.

 No-fault automobile negligence cases remain a dominant factor in Michigan civil filings every year. Of the 46,216 new civil filings in Michigan circuit courts in 2008, 8,477 — or more than one-fifth of all civil cases — were automobile related. See 2008 Annual Report of the Michigan Supreme Court, p 30 <http://www.courts.michigan.gov/scao/resources/ publications/statistics/2008/2008execsum.pdf> (accessed June 18, 2009). Further, because many, if not most, no-fault claims settle out of court, the number of claims potentially affected by this Court’s ruling is much higher than the number of cases filed.

 Somewhat confusingly, the Court considered the purported facts underlying the recusal motion, but also conceded that there was “no procedure for judicial factfinding....” Caperton, 129 S Ct at 2264.

 As former Chief Justice Taylor suggested to Michigan Lawyers Weekly. “ ‘You can’t set up the kind of test the U.S. Supreme Court created in Caperton without giving parties the opportunity to have a hearing.... Where else or how else will they be able to adduce the facts needed to meet the new objective test?’ ” MSC recusal rule may not be constitutional, Michigan Lawyers Weekly, June 15, 2009, p 23.
Moreover, as Justice Young intimates, the narrow Caperton holding— that, under some circumstances, an elected judge is disqualified from hearing a case on the basis of contributions to his or her campaign — is also directly implicated in this case and will continue to be regularly implicated in cases before this Court given the current state of Michigan election law. As it bears on this case, at her January 8, 2009, investiture ceremony, Justice Hathaway attributed her election to various organizations that supported her campaign. Investiture Ceremony for the Honorable Diane M. Hathaway, 483 Mich cliii, clxviii (2009). Of particular note is her acknowledgment of the Michigan Association for Justice (MAJ); the MAJ has explicitly supported the defendants in these cases and filed an amicus curiae brief in support of the motion for rehearing. Organizations that supported Justice Hathaway’s campaign, including the AFL-CIO, whose president, Mark Gaffney, acted as master of ceremonies at the investiture proceeding, are also members of the Coalition Protecting Auto No-Fault, which filed an amicus curiae brief in these cases opposing Justice Hathaway’s recusal. Further, these cases involve insurance companies as parties. During her campaign, Justice Hathaway regularly spoke out against insurance companies and suggested that she would not “ ‘sid[e] with big insurance companies’ ” if she were elected to this Court. Hathaway sworn in as MSC’s 104th justice, Michigan Lawyers Weekly, January 12, 2009, p 2. Upon her investiture as a justice of this Court, she told the Detroit News: “ ‘For at least 10 years, the Michigan Supreme Court has been in favor of insurance companies.... [Now] I think we will see a lot more real justice out of this Supreme Court.’ ” Michigan Supreme Court to swear in newest justice, Detroit News, January 8, 2009. Under an objective Caperton inquiry, it seems inescapable that such comments must be analyzed to establish whether the circumstances “ ‘offer a possible temptation to the average... judge to ... lead him not to hold the balance nice, clear and true,’ ” Caperton, 129 S Ct at 2264, quoting Tumey, supra at 532, or suggest “a serious, objective risk of actual bias,” Caperton, 129 S Ct at 2265.
*59 Finally, I note the significant fact that Caperton provides no guidance concerning how to evaluate the effect of anonymous campaign expenditures, which are common in Michigan, as I discuss in n 1 of this statement. Indeed, anonymous and independent expenditures during the 2008 election season included $1.4 million garnered by the Democratic Party from undisclosed donors to underwrite a TV ad campaign impugning Justice Hathaway’s opponent, former Chief Justice Taylor. In Michigan courts, it’s the public that’s blindfolded, Detroit Free Press, June 14, 2009. At this time, it is totally unclear how a court attempting to comply with Caperton would take such donations into account. As Justice Benjamin presaged in his W Va Caperton concurrence,
every judicial officer in this state is subject to having to decide the merits of a case that involves a party or attorney who contributed to or supported, or, conversely, opposed his or her campaign for office. This now includes those who contribute to or support so-called Independent Expenditure Groups who engage in political campaigns completely independent of candidates of office.
If the Appellees’ argument became the law, every judicial officer in this state would he disqualified from any and every case in which an independent nonparty organization over which the judicial officer had no control received contributions from individuals or groups which included a person or entity affiliated with a party or an attorney in the case, when the independent nonparty organization used its contributions to wage a campaign against the judicial officer’s electoral opponent. Conversely, such a standard would likely require a judge also to recuse himself or herself when an independent expenditure group operated against the judge or supported the judge’s opponent. Our judicial system would break down under such a standard for disqualification. [W Va Caperton, supra at 699, 703-704.]
Clearly, without the benefit of further study and a process for objective fact-finding, this Court is ill-equipped to properly resolve the complex questions presented by Caperton.

 The summary nature of the majority’s treatment of this disqualification motion indeed may lead the MCCA to test its due process claim in federal court under 42 USC 1983 rather than in this Court. This is yet another reason why we should allow the parties to brief the Caperton due process question.

 See Caperton, 129 S Ct at 2274 (Scalia, J., dissenting).