[Cite as *C.T. v. N.Y.*, 2023-Ohio-3029.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [C.T.], | : | |
| Petitioner-Appellee, | : | No. 22AP-499 |
| | | (C.P.C. No. 22DV-0511) |
| v. | : | (REGULAR CALENDAR) |
| [N.Y.], | : | |
| Respondent-Appellant. | : | |

D E C I S I O N

Rendered on August 29, 2023

**On brief:** *Christopher S. Cook*, for appellant. **Argued:**
*Christopher S. Cook*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

EDELSTEIN, J.

{¶ 1} Respondent-appellant, N.Y., appeals from an order of the Franklin County Court of Common Pleas, Division of Domestic Relations, issuing a domestic violence civil protection order ("DVCPO") to petitioner-appellee, C.T., on July 21, 2022. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} C.T. and N.Y. were involved in a romantic relationship from 2018 to 2020 and continued to see each other sporadically through 2021. The parties have a son together,

who was born on May 11, 2021.  C.T. and N.Y. each filed petitions for a DVCPO against the other on March 24, 2022 following an altercation that took place on March 23.[1]

**{¶ 3}**   In her petition, C.T. alleged she was assaulted that day by N.Y. when he arrived to pick up their son.  She further noted that N.Y. made verbal threats to her in February 2022, and she described an incident on November 27, 2021, when N.Y. appeared at her house, "banging on [the] door" and threatening her and her children.  (Mar. 24, 2022 Addendum to C.T. Petition.)  She also described a physical assault that allegedly occurred in late 2019.  *Id.*

**{¶ 4}**   The trial court granted each party a temporary protection order and set both petitions for a consolidated evidentiary hearing.  The hearing on both petitions took place over May 11, May 12, May 13, and May 16, 2022.  N.Y. was represented by counsel and C.T. proceeded pro se.  The trial court heard testimony from C.T. and N.Y., as well as two witnesses called by C.T.

**{¶ 5}**   The impetus for the petitions was an altercation between the parties around 5:00 p.m. on March 23, 2022, when N.Y. brought a copy of paternity test results to C.T.'s house while picking up their son.  Earlier that day, C.T. received a text message from N.Y. with a picture of the results, but she told him the document did not come through clearly. N.Y. agreed to bring his physical copy at their scheduled pick-up time but asked C.T. not to take it from him because it was his only copy.  When he arrived, C.T., who was on a work call, took their son from the babysitter, and met N.Y. outside.

**{¶ 6}**   C.T. took the paternity results out of N.Y.'s hands to get a better look at the document.  (Hearing Tr. at 8.)  She testified that she was still holding their son at that time. (Tr. at 8-9.)  She also testified that N.Y. grew frustrated and "yelled and threatened [her] while physically blocking all entrances to [her] home when [she] tried to enter."  (Tr. at 8-9.)

**{¶ 7}**   C.T. testified that at this point, the conflict turned physical, and N.Y. began to punch and kick while she was still holding their son, eventually knocking her to the ground.  (Tr. at 9.) Hearing the commotion, the babysitter ran outside to retrieve the child,

---

[1] Because the appeal was taken from the trial court's order granting C.T.'s petition, N.Y.'s petition against C.T. is not part of the record on appeal.

and C.T. attempted to follow. (Tr. at 9.) However, according to C.T., N.Y. "slammed [her] against the door" and stuck his foot in the door so she could not close it. (Tr. at 9.) C.T.'s eight-year-old daughter heard the altercation from inside the house and called her family for help, while N.Y. called the police. (Tr. at 9-10.) The arrival of C.T.'s father, her son, and the police put an end to the confrontation. (Tr. at 10.) C.T. took photos of her injuries over the following days, copies of which were submitted to the court. (Exs. A6-A10, A14, A15.)

{¶ 8} After C.T. presented as testimony her own version of the incident, she called the babysitter, T.A., to testify. T.A. described an incident in February 2022 when she was at C.T.'s home babysitting. (Tr. at 131.) N.Y. showed up at the house and asked T.A. how much she was paid, and if he could have her phone number in order to send her money. (Tr. at 132.) She had not expected the visit, as C.T. typically gave her notice that he would be stopping by, and the incident made her uncomfortable. (Tr. at 129, 134.) T.A. also described her recollection of the events on March 23. She recalled hearing the argument outside and beginning to record it from inside the house. (Ex. A2; Tr. at 138-39.) T.A. grew concerned for the infant and stopped recording to retrieve him from C.T.'s arms. (Tr. at 138-39.) While getting the baby, she saw N.Y. block C.T., who was trying to enter the home behind her. She testified that she took the child into the laundry room for safety. (Tr. at 140.)

{¶ 9} C.T. next called a second witness, her co-worker, W.S. W.S. testified that she was on a videoconference call with C.T. when N.Y. arrived at the residence. (Tr. at 148.) While still on the video call, she heard yelling and then saw C.T. fall. (Tr. at 149.) C.T. yelled for someone to call the police, and W.S. hung up and dialed 911, telling them about the altercation and asking for police to be sent to C.T.'s address. (Tr. at 149.) After getting off the phone with 911, W.S. called C.T.'s daughter over FaceTime, who "answered in a panic. She was crying." *Id.* W.S. could hear a man yelling in the background. (Tr. at 150.) She told C.T.'s daughter to stay on the phone with her and began driving to C.T.'s house. *Id.* When she arrived, the altercation had subsided, and police officers were taking statements from C.T. and N.Y. (Tr. at 151.)

{¶ 10} During her presentation of the case, C.T. also testified about several other incidents that occurred prior to the March 23 altercation. She described an incident in

December 2019, when N.Y. attempted to take back gifts he had given C.T. for her birthday. She testified that N.Y. yelled at her, pinned her against the couch, and choked her when she refused. (Tr. at 51.) C.T.'s older son was present during that altercation and "yelled out something to [N.Y.]," causing him to charge at her son before they could shut the door. (Tr. at 52.) C.T. introduced a copy of a text message N.Y. sent to her son apologizing for the incident, as well as an apology letter he addressed to C.T. (Tr. at 52; Ex. A12; Ex. A13.) C.T. also described an argument that occurred on December 15, 2020, which C.T. recorded on her cell phone. She testified that at some point during the argument, N.Y. took a cup of ice water in the car and threw it at C.T. The audio recording corroborated her testimony on that point. (Tr. at 42-43; Ex. A11.) C.T. also testified that in March 2021, N.Y. visited her while she was in the hospital. She testified that he became upset during the visit, and she asked him to leave. He refused, slamming the screen of her laptop onto her hand before being escorted out by hospital security. (Tr. at 39-40.) In November 2021, C.T. blocked N.Y.'s phone number. She testified that, in response, N.Y. "showed up unannounced to [her] house, banging profusely, woke up the kids." (Tr. at 34.)

{¶ 11} N.Y. also testified regarding his version of the events. He testified that before arriving at C.T.'s home, he texted a request that she not take the paternity results from his hands. (Ex. 5; Tr. at 189.) N.Y. stated that while he was in the doorway to C.T.'s home, asking her to return the papers, she punched him twice in the eye and once in his lip. (Tr. at 221.) After the altercation ended, N.Y. took pictures of the injuries he claims were caused by C.T. (Exs. 2-4.) He said he remained in the doorway following her assault, at which point she began to push him. (Tr. at 228.) N.Y. testified he did not want to allow her inside the home because he feared she would destroy his paternity paperwork. (Tr. at 230.) C.T. also attempted to enter her residence through the garage. N.Y. recalled that he stood by the garage door keypad to prevent her from opening the door there as well. (Tr. 230-31.) N.Y. unequivocally denied striking C.T. at any point during the March 23, 2022 incident. (Tr. at 231.)

{¶ 12} C.T. moved to introduce 15 exhibits in support of her petition. Exhibits A1 through A5 and A12 through A15 were admitted without objection. N.Y.'s objections to Exhibits A6 through A11 were overruled, but the trial court limited Exhibit A11, a video recording, to a redacted version and excluded the unredacted version originally introduced

by C.T. N.Y. introduced five exhibits, all of which were admitted without objection.[2] These included a copy of the police report made on March 23, 2022 (Ex. 1), photographs of his injuries from the March 23 altercation (Exs. 2-4), and the text message he sent C.T. prior to arriving at her home asking her not to take his copy of the paternity results (Ex. 5).

{¶ 13} On July 21, 2022, the trial court issued a judgment entry on C.T.'s petition, noting it would issue its decision on N.Y.'s petition by separate order. The trial judge, serving as the factfinder, weighed the credibility of the witnesses and considered the evidence properly before it. The trial court found C.T.'s version of the altercation on March 23, 2022 to be more credible than N.Y.'s, and, coupled with past incidents of physical violence, determined she had a reasonable belief that she was in imminent danger. Accordingly, the court found "by a preponderance of the evidence that [C.T.] had and continues to have a reasonable belief that [N.Y.] poses a risk of serious harm or injury at the time specified" and issued C.T. a protection order for a period of two years. (July 21, 2022 Jgmt. Entry at 8.)

## II. Assignments of Error

{¶ 14} N.Y. timely appeals and assigns the following assignments of error for our review:

> [I.] The Trial Court abused its discretion and erred as a matter of law in is[s]uing [a] civil protection order as against Appellant [N.Y.].
>
> [II.] The Trial Court in abusing its discretion violated Appellant's constitutional rig[h]ts to both procedural due process and right to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.
>
> [III.] The Trial Court abused i[t]s discretion and erred as a matter of law in permitting pro se Appellee to present evidence by pre-written documents and by permitting pro se Appellee to

---

[2] N.Y. recorded over an hour of audio during the encounter on his cellphone, and counsel attempted to introduce snippets from the recording as exhibits in N.Y.'s case-in-chief. (Tr. at 210.) After the court ordered N.Y.'s trial counsel to share the unedited recording in its entirety with C.T. before clips could be used as individual exhibits, N.Y. withdrew his request to introduce any portion of the audio into the record. (Tr. at 212.)

introduce evidence of alleged prior bad acts by Appellant dis
allowed by Evidence Rule 404(B).[3]

## III. Discussion

### A. First Assignment of Error

{¶ 15} In his first assignment of error, N.Y. contends the trial court's decision to grant C.T.'s petition for a civil protection order was an abuse of discretion and erroneous as a matter of law. Specifically, N.Y. argues the ongoing assistance the trial court provided to C.T. during the hearing amounted to an abuse of discretion and demonstrated bias in her favor.

{¶ 16} "To receive a civil protection order, a petitioner must show by a preponderance of the evidence that the petitioner or the petitioner's family or household members are in danger of domestic violence." *Crabtree v. Dinsmoor*, 10th Dist. No. 13AP-342, 2013-Ohio-5797, ¶ 10. "Placing another person by the threat of force in fear of imminent serious physical harm" constitutes an act of domestic violence pursuant to R.C. 3113.31(A)(1)(a)(ii).

{¶ 17} The issuance of a civil protection order will not be disturbed on appeal unless the judgment is against the manifest weight of the evidence. *B.B. v. J.B.,* 10th Dist. No. 22AP-305, 2023-Ohio-1870, ¶ 17. "While we must consider the credibility of witnesses in conducting a manifest-weight review, we are guided by the presumption that the trial court, which heard the testimony and was able to observe the witnesses' demeanors, inflections, gestures, and mannerisms, is in the best position to judge the witnesses' credibility." *Id.* at ¶ 19. However, questions of law that arise from the proceedings are reviewed de novo on appeal. *J.W. v. D.W.,* 10th Dist. No. 19AP-52, 2019-Ohio-4018, ¶ 16.

{¶ 18} Under R.C. 3113.31, a trial court is required to conduct a "full hearing" on a petition before it may issue any type of civil protection order other than a temporary ex parte order. *D.M.W. v. E.W.,* 10th Dist. No. 17AP-359, 2018-Ohio-821, ¶ 11. While "full hearing" is not defined in the statute, we have found it requires, at a bare minimum, the

---

[3] We note that on page 14 of his brief, N.Y. sets forth different language for his third assignment of error: "The trial court abused its discretion by permitting Appellee to present evidence non-conforming to the presentation of evidence in permitting Appellee to prese[n]t video power point recordings which included along with the video presentation also included additional accompanying written explanations regarding the contents of these videos." (Capitalization deleted.) (Appellant's Brief at 14.)

opportunity for both parties to present evidence and make arguments at a proceeding on a contested DVCPO petition. *Id.* at ¶ 12. A respondent is denied a "full hearing" if procedural irregularities preclude a meaningful resolution of the weight and credibility of the evidence. *See, e.g.*, *Tarini v. Tarini*, 10th Dist. No. 12AP-336, 2012-Ohio-6165, ¶ 16. In *Tarini*, for example, we found that the trial court deprived a petitioner of a full hearing when it refused to permit rebuttal arguments after the respondent had rested. *Id.* Similarly, we have found reversible error when a trial court prohibited a respondent and his counsel from participating in any manner at the civil protection order hearing. *D.M.W* at ¶ 13. We explained that "[t]he trial court was aware appellant and his counsel were present and prepared for a full contested hearing, yet it did not permit appellant or counsel to appear before the court to present evidence. The trial court's failure to conduct a 'full hearing' as contemplated by R.C. 3113.31 constitutes reversible plain error." *Id.*

{¶ 19} Although a pro se litigant cannot expect special treatment from the courts and must be held to the same standards as litigants represented by counsel, *C.W. v. J.S.*, 10th Dist. No. 21AP-284, 2022-Ohio-1951, ¶ 36, we are mindful that "Ohio jurisprudence favors deciding cases on their merits rather than on procedural grounds whenever possible." *Natl. City Bank v. Kessler*, 10th Dist. No. 03AP-312, 2003-Ohio-6938, ¶ 13. Thus, to accommodate a party proceeding pro se, Ohio courts tasked with balancing these competing interests may permit a certain amount of latitude towards pro se litigants without disregarding the rules. *Goodrich v. Ohio Unemp. Comp. Rev. Comm.,* 10th Dist. No. 11AP-473, 2012-Ohio-467, ¶ 25. As a result, domestic relations proceedings may be flexible and informal as long as they permit litigants a full and fair opportunity to be heard. *See, e.g.*, *J.S. v. L.S.*, 10th Dist. No. 19AP-400, 2020-Ohio-1135, ¶ 18 (Internal quotations omitted.) ("A pro se hearing on a [civil protection order] can still be a full hearing within the meaning of R.C. 3113.31 even where the hearing lacks formality and structure.").

{¶ 20} In *J.S.*, for example, both parties represented themselves during a DVCPO hearing. On appeal, this court noted that "[t]he hearing was somewhat freeform, perhaps deliberately so, in order to allow two pro se parties the opportunities to be fully heard." *Id.* Finding both parties had a meaningful opportunity to be heard, we overruled the appellant's two assignments of error challenging the informality and inadequacy of the proceedings. *See also J.W.* at ¶ 34 (finding that a petition hearing, "while lacking some

formality and structure, did allow [pro se] appellant the opportunity to present evidence and make her argument against the [civil protection order]" and thus provided a meaningful opportunity to be heard in satisfaction of R.C. 3113.31); *C.W.* at ¶ 38 ("Although the hearing, including the manner in which the parties presented their evidence, was somewhat informal and unstructured, perhaps given the parties' choice to proceed pro se, the record reveals that appellant was afforded ample opportunity to present his testimony and arguments.").

{¶ 21} In this case, N.Y. is not asserting he was deprived of the opportunity to be meaningfully heard by the trial court. There are no claims that the trial court's purported "bias" towards C.T. denied him the ability to call witnesses, present evidence, make arguments, and rebut the assertions of C.T. Instead, he argues that "the Judge was actually instructing Appellee the types of questions to ask, but in addition, what wording Appellee should use," which resulted in an unfair advantage at the hearing. (Appellant's Brief at 11.)

{¶ 22} Because the first assignment of error challenges whether the process by which the trial court issued the DVCPO was in accordance with law, we apply a de novo standard of review.[4] In relevant part, R.C. 3113.31(D)(2)(a) requires the court "give the respondent notice of, and an opportunity to be heard at, [a] full hearing." Here, N.Y. has not demonstrated how the procedural assistance provided to C.T. either affected his ability to present evidence, led to the improper admission of inadmissible evidence, or affected the credibility determinations made by the trial court, such that he was denied an opportunity to be meaningfully heard at a full hearing. Instead, the direction given by the trial court served a dual purpose: it allowed a pro se litigant a meaningful opportunity to be heard on the merits of her claim, while also enforcing rules and procedures designed to protect the integrity of the proceedings. While the assistance provided to C.T. may have been above ordinary, there are no instances in which the trial court disregarded a rule to permit otherwise inadmissible evidence into the record. Moreover, the direction provided to C.T. did not diminish N.Y.'s corresponding right to be meaningfully heard.

---

[4] While the first assignment of error describes the court's issuance of the order as both an abuse of discretion and an error of law, N.Y. only argues the latter in his brief. It is insufficient to merely state an assignment of error without actually arguing it in the brief. *See* App.R. 12(A). *See also* App.R. 16(A)(7). Because N.Y. does not argue the trial court's order was against the weight of the evidence, we limit our discussion to whether the process by which the trial court issued its order was in accordance with law.

{¶ 23} N.Y. has also not provided any explanation for how this procedural assistance affected the outcome of the case. The assistance did not curtail his ability to present evidence, make arguments, or rebut assertions made by C.T. Our review of the record demonstrates that some competent, credible evidence existed to justify the trial court's finding that C.T. reasonably feared imminent serious physical harm. The evidence considered by the court was admissible and conformed with the Rules of Evidence, and we disagree that C.T. only met her burden due to the informality of the proceedings and the procedural assistance provided by the trial court.

{¶ 24} We therefore overrule the first assignment of error.

### B. Second Assignment of Error

{¶ 25} In his second assignment of error, N.Y. asserts that the conduct of the trial court judge violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments. In his argument, he contends that permitting C.T. to read her testimony from a prepared written statement at the hearing violated his procedural due process rights by depriving him of the right to a fair and impartial trial and the right to face his accuser. He cites *Goss v. Lopez*, 419 U.S. 565 (1975) and *Tumey v. Ohio*, 273 U.S. 510 (1927) in support of his argument. But these cases are inapposite and have no bearing on our resolution of this assignment of error. Additionally, N.Y. has not explained how either case is in any way related to this one. In *Goss*, the Supreme Court of the United States found suspending students without the opportunity for notice or a hearing implicated the students' liberty and property interests under the Due Process Clause of the Fourteenth Amendment. *Goss* at 575-76. In *Tumey*, the court found the prosecution of a criminal defendant by someone with a "direct, personal, pecuniary interest in convicting the defendant" violated the defendant's due process rights. *Tumey* at 523.

{¶ 26} Here, N.Y. has not identified the liberty or property interest implicated in the DVCPO hearing. Regardless, as discussed in the first assignment of error, N.Y. was afforded what the parties in *Goss* and *Tumey* lacked—notice and an opportunity to be heard. Although C.T. presented her direct testimony by reading a prepared statement, counsel for N.Y. was able to cross-examine her during the proceedings, and the trial court sustained an objection to testimony concerning an incident not noticed in C.T.'s petition. (May 11, 2022 Tr. at 13.)

**C. Third Assignment of Error**

{¶ 27} In his third assignment of error, N.Y. asserts the trial court abused its discretion by permitting C.T. to present evidence by pre-written documents and by permitting evidence of prior bad acts prohibited by Evid.R. 404(B).

{¶ 28} The record reflects that at the beginning of the hearing, C.T. began by reading from a prepared statement and then stated, "I would like to introduce several exhibits." (Tr. at 10.) It was not clear whether she was presenting her opening statement or her own direct testimony. After counsel objected, the court explained opening statements do not contain testimony or evidence, and asked if she wanted to proceed with a brief overview of her case and then introduce exhibits. (Tr. at 14.) C.T. agreed. N.Y.'s trial counsel also noted his understanding. *Id.* Contrary to N.Y.'s assertion on appeal, the record reflects that the trial court did not consider any of C.T.'s opening remarks as evidence. (*See*, *e.g.*, Tr. at 15.) This court is not aware of any case law preventing a party from relying on written notes during an opening statement.

{¶ 29} N.Y. next argues under this assignment of error that the trial court erred in permitting C.T. to present video recordings with "accompanying written verbiage explaining what the video was, and explaining the contents of the video." (Appellant's Brief at 15.) During the hearing, C.T. presented a number of video clips that she had consolidated into a single PowerPoint presentation with text captions accompanying the videos. Trial counsel objected to the admission of the PowerPoint itself, and the court sustained the objection. (Tr. at 20-21.) While N.Y. claims on appeal that the trial court continued to allow presentation of this "hybrid-type evidence," he does not assert, and the record does not reflect, that the trial court improperly relied on the text in the PowerPoint or was prejudiced by viewing it before sustaining the objection. (Appellant's Brief at 15.)

{¶ 30} Finally, N.Y. also asserts as part of his third assignment of error that the trial court improperly considered prior bad acts from 2017 and 2019 that should have been excluded under Evid.R. 404(B).[5] As discussed above, the trial court sustained counsel's objection to testimony regarding the 2017 incident. With regard to other "prior bad acts,"

---

[5] N.Y. also unrelatedly notes in his brief that these prior bad acts appear to make both N.Y. and C.T. "equally culpable." (Appellant's Brief at 15.)

as they are described by appellant, a decision on a petition to grant a DVCPO requires the court to determine whether the petitioner's fear was both subjectively and objectively reasonable under the circumstances. *Fleckner v. Fleckner*, 10th Dist. No. 07AP-988, 2008-Ohio-4000, ¶ 23. Reasonableness is determined through reference to the parties' history. *Id*. at ¶ 21. *See also T.S. v. B.S.*, 10th Dist. No. 18AP-302, 2018-Ohio-4987, ¶ 24 ("A court should determine whether the fear is reasonable with reference to the history between the parties."). "Thus, past acts of domestic violence can establish that the petitioner has a genuine, reasonable fear of violence in the present circumstances." *Crabtree*, 2013-Ohio-5797 at ¶ 13. Because the parties' history, especially specific acts of alleged domestic violence, is relevant to C.T.'s assessment of the encounter on March 23, 2022, the trial court did not err in considering testimony about events from years prior.

{¶ 31} We therefore overrule N.Y.'s third assignment of error.

## IV. Disposition

{¶ 32} Based on our independent review of the record, we conclude the trial court's decision to grant C.T.'s DVCPO petition against N.Y. was in accordance with law. We overrule N.Y.'s three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

LUPER SCHUSTER and LELAND, JJ., concur.

———————————————